THE STATE v. EDWARD KELLEHER, Appellant.

Division Two, December 14, 1909.

1. **DYING DECLARATIONS: Res Gestae.** Dying declarations as to all matters occurring anterior to the killing and not immediately connected with it, are not a part of the *res gestae*, and are inadmissible.

2. ————: **Admitted on Former Trial: Res Adjudicata.** A defendant in a second trial is not precluded from interposing objections to testimony which was admitted on a former trial without objection. Defendant at the second trial may object to parts of a dying declaration which were not objected to on the former trial, although other things embraced therein were then objected to and erroneously admitted.

3. ————: **Material Matters.** Statements in the dying declaration that deceased went into the saloon where the killing occurred on the solicitation of a State's witness to get a drink, is not only incompetent as a part of the *res gestae*, but it can-

224 Sup—10

not be held to be harmless, especially in view of the testimony of other witnesses to the effect that a short time before the fatal encounter deceased had stated he was going up to that saloon to get even with defendant.

4. **WITNESS: Ex-Convict: Competency.** Whether or not a convict in the penitentiary, brought by a guard to the trial and in his custody, is competent to testify on behalf of the State, is not decided; but it is held that an ex-convict, who has been pardoned, is competent.

5. **INSTRUCTIONS: Imperfect Self-Defense.** For the reasons stated in the opinion on the former appeal, 201 Mo. 614, it is held the trial court did not err in refusing defendant's instructions on the subject of imperfect self-defense.

Appeal from St. Louis City Circuit Court.—*Hon. Daniel D. Fisher,* Judge.

REVERSED AND REMANDED.

*Thos. B. Harvey* for appellant.

(1)  The court erred in admitting portions of the dying declaration objected to by defendant on the ground that they were not a part of the *res gestae.* Those portions all tended to prove facts anterior to the homicide and not "the act of killing, and the circumstances immediately attending it, and forming a part of the *res gestae*" of the homicide. True, all of the answers except those given to the last two questions, are comparatively harmless, their principal value to the prosecution being for corroboration of the witness Howard; but the last two answers to the effect that it was upon Howard's casual suggestion and request that they went into Walsh's saloon were most vital and prejudicial to the theory of the defense, which was that the deceased was that night breathing threats against the defendant, expressing a determination to go to Walsh's saloon where defendant worked and "get" him; and that it was upon his own initiative and for the purpose of executing his threats that he went to Walsh's. The evidence was recognized by the

prosecution as being of such great importance in secur-
ing a conviction of the defendant, that its admission
was insisted upon in the teeth of the aforesaid well-
established rule of evidence as announced not only in
other cases, but also in this very cause itself when
formerly before this court. State v. Kelleher, 201 Mo.
638. Under the rule, the dying declaration must be
rigidly confined to the identity of the defendant and
the *res gestae*—the facts attending the homicidal act.
State v. Draper, 65 Mo. 340; State v. Van Sant, 80 Mo.
76; State v. Bowles, 146 Mo. 16; State v. Parker, 172
Mo. 202; State v. Kelleher, 201 Mo. 638. (2) William
Taylor, while serving a sentence in the penitentiary
for a felony, was incompetent as a witness. The wit-
ness was convicted and sentenced to seven years in the
penitentiary for perjury, and while serving said term
of imprisonment he was brought from the penitentiary
by a guard and offered as a witness by the prosecution.
Sec. 2564, R. S. 1899, disqualifies a convict from being
a witness while confined in the penitentiary, except
with reference to crimes committed by fellow convicts
whilst they and the witness are imprisoned. Ex parte
Marmaduke, 91 Mo. 228. The reason for this statute
and the one that appealed more strongly to the good
judgment of the Legislature and its sense of justice,
was to avoid opening fountains of perjury in every
court of the State by tapping the unlimited supply in
the large and well-filled reservoir of the penitentiary.
If the great majority of those imprisoned there are as
weak and as morally irresponsible as they are sup-
posed to be, the mere opportunity for temporary re-
lief from their hardships and torture would be suf-
ficient inducement for them to become witnesses for
either party to a criminal cause; but add to the afore-
said inducement the opportunity to please the officials
of the State which holds them in prison, and thus
securing a speedy and permanent relief from their suf-
ferings, and a premium is placed on their perjury

which hardly one of them could resist. And the case at bar is a forcible illustration. (3) The second and third instructions requested by the defendant on the subject of imperfect self-defense, should have been given.

*Elliott W. Major,* Attorney-General, and *John M. Atkinson,* Assistant Attorney-General, for the State.

(1) Appellant objected to one Wm. Taylor, who had previously been convicted of perjury in connection with his testimony in this case before the grand jury, and who was then serving a seven-year sentence in the penitentiary, from testifying as a witness in this cause, on the ground that said witness "was being imprisoned in the penitentiary under sentence for a felony." Sec. 4680, R. S. 1899, provides: "Any person who has been convicted of a criminal offense is notwithstanding, a competent witness." The fact that the witness, Taylor, was still serving on his sentence in the penitentiary in no way made him incompetent as a witness. It would be conceded without argument that said Taylor would be a competent witness after his sentence is completed. State v. Myers, 198 Mo. 251; State v. Minor, 117 Mo. 302. Besides, counsel for appellant proceeded to cross-examine said witness at length as to new matter. He thereby waived any right to object to the competency of said witness. Edwards v. Latimer, 183 Mo. 627; State v. Hope, 100 Mo. 347; Maxwell v. Railroad, 85 Mo. 95; Hickman v. Green, 123 Mo. 173; Nichols v. Nichols, 147 Mo. 403. (2) The objections to portions of the *ante-mortem* statement are a new supply interposed for the first time by counsel at the second trial in this cause. The former opinion on this point based upon the *ante-mortem* statement is *res judicata,* and the point is not open for further review. Besides, we do not think that any of the above questions and answers of the *ante-mortem* statement objected to by appellant in any way violate the rule as

laid down in the cases of State v. Draper, 65 Mo. 335
and State v. Bowles, 146 Mo. 6. Nothing contained in
either of said questions and answers tends in the least
to the prejudice of appellant. The objections are hyper-
critical in the extreme. (3) There is no evidence to
warrant the giving of either of the instructions re-
quested by the defendant at the second trial. Defend-
ant was either guilty of murder in the first or second
degree, or was justified on the ground of self-defense
for the killing of deceased. Hence, we say the court
properly refused said instructions, and no error was
thereby committed.

FOX, J.—This cause is now pending before this
court upon appeal by the defendant from a judgment
of conviction of murder in the second degree in the
circuit court of the city of St. Louis, Missouri. In
what was known as Walsh's saloon, located at the
northeast corner of Pine and 22nd streets, in the city
of St. Louis, between two and three o'clock Sunday
morning, January 29, 1905, defendant, Edward Kell-
eher, with a pistol, shot and killed Thomas Sullivan, a
prize fighter by profession and known as "St. Louis
Tommy Sullivan" in prize fighting circles. The de-
fendant was charged by indictment with murder of
the first degree, for the killing of said Sullivan. The
sufficiency of the indictment is not challenged, hence
there is no necessity for reproducing it.

This is the second appeal of this cause. See State
v. Kelleher, 201 Mo. 614.

The evidence on the part of the State at the sec-
ond trial tended to show that Herman Sellinger, Mike
Morissey, William Taylor and the defendant, Edward
Kelleher, were all standing at the bar in said Walsh's
saloon drinking, when Sullivan and the witness, John
Howard (now deceased), came into the saloon, and
Howard ordered the drinks for himself and deceased,
Sullivan; that the defendant was standing near a water

cooler at the north end of the bar, which ran north and south in said saloon; the next south to him was a friend of defendant's by the name of Sellinger, and at the extreme south end of the bar, next to the partition or swinging door, near the front entrance of said saloon, stood the defendant, Edward Kelleher, and near the bar stood the witness, William Taylor. A man by the name of Gerwitz was the barkeeper. There were only two shots fired, and those by defendant. One bullet went wild and hit the bar, and the other one entered the body of deceased in the right side, just below the ninth rib, in what is known as the axillary line, and ranged forward to the left and downward and came out about one inch to the left side and one-half inch above the umbilicus. Deceased went from said Walsh's saloon to Bumberry's saloon near by, and after remaining there for a few minutes was taken to the city hospital, where an operation was performed on him early that day. Deceased died on the following Friday morning, February 3rd, of septic peritonitis, due to the pistol shot wound in the abdomen, as above described.

To fully appreciate the nature and character of the testimony it is well to give a brief statement of the testimony of the witnesses as to the main facts developed at the trial of this cause. We have examined in detail the record disclosing the evidence, and by verification find that the learned counsel for appellant, in his brief abstract of the evidence of the various witnesses, substantially states the leading features of the testimony of such witnesses, as disclosed by the record.

John Howard was a witness in this cause upon the former trial and the testimony of Howard was preserved for the purpose of review, upon the former appeal. This witness, at the time of the second trial, was dead, and his testimony, which was preserved in the bill of exceptions, was presented to the jury. The

main features of his testimony were as follows: I am a bartender in my father's saloon at 1900 Chestnut street. I knew the deceased for several years and we were friendly and intimate for about a year before his death. I also knew the defendant to speak to him for a long time. I met the deceased about 1:30 a. m., on the night of the shooting at Manley's saloon, 21st and Chestnut streets. We had two or three drinks of whiskey there and after about thirty minutes we went to Walsh's saloon at 22nd and Pine streets. I saw Edward Kelleher, Herman Sellinger and William Taylor standing at the bar in the order named, the defendant standing near the south end of the bar which was on the east side of the room and ran north and south. I don't recall to have seen Mike Morissey in there. I saw two or three other persons standing near the music box which was against the west wall and about opposite the middle of the bar. I recognized one of them as a man whom I knew by sight as McTaff or McTague. Deceased and I walked up to the bar and took a position between Sellinger and Taylor, Sellinger being to my right, Kelleher next to him, the deceased to my left and Taylor behind him. I ordered drinks for deceased and myself and just as we had about taken them, Kelleher applied an epithet to deceased and said, "You are a fighter; this ain't no place to come looking for trouble." Then deceased jumped back "like that" (illustrating), and then I saw the gleam of a revolver and heard a shot, and I started to run, and as I ran toward the front door I heard another shot. 1 could not say when Kelleher pulled the gun or where from. When I first turned upon hearing him speak to deceased, I did not see it. I did not wait to see what Sullivan did. "As soon as he reached back I turned. I saw the flash of the gun and saw the flash of the shot and run." I next saw the deceased at the hospital that morning, when he said to me, "I am a croppy, I am a dead one." I don't know whether deceased said anything to Kel-

leher before Kelleher addressed him or not; I did not hear him if he did. "I could not say whether they had any altercation or not, I don't know."

Cross-Examination: Deceased was a prize fighter and roomed at my father's at 1914 Chestnut street. I lived with "my girl," Maude Brooks, at 2024 Pine street. "I generally drink about 25 or 30 whiskeys a day and 40 or 50 beers." The night of the shooting I had drunk 10 or 12 whiskeys and 14 or 15 bottles of Budweiser. Defendant was a barkeeper at Walsh's saloon at 22nd and Pine streets, and deceased was accustomed to staying a good deal in the neighborhood at Kehoe's saloon, between 22nd and 23rd on Pine street. As we went in Walsh's saloon I spoke to Sellinger, but I did not hear deceased speak to anybody. After we took our places against the bar I did not look at any of the parties while waiting for and while drinking our drinks. I don't know whether Taylor was in the room when the shooting occurred, and I did not take any notice of what the deceased was doing, nor at whom he may have been looking. I do not know of any previous trouble between Kelleher and deceased, and I do not know what Kelleher referred to when he said to deceased, "This is no place to come to look for trouble." I don't know whether I stated at the inquest that Kelleher applied an epithet to the deceased. Kelleher had no gun in his hand when he spoke to deceased, nor until deceased jumped back from the bar and threw his hand back. "If he had any in his hand I certainly would have seen it." After Kelleher addressed the deceased he jumped back and faced Kelleher and threw his hands back (illustrating by taking a position); I can't say what he was reaching for. I was arrested during the night and I then and several times afterwards denied positively to the police that I knew anything about the shooting.

William Taylor, a witness introduced by the State, in substance testified as follows: I am known as

"Buck" Taylor; for the past two years I have been in the penitentiary at Jefferson City serving a seven-year sentence for perjury. I was brought down here by a guard to testify, and after testifying I expect to be taken back for further imprisonment under said sentence. I was with Kelleher, Morissey and Sellinger the night of the shooting and we were in Walsh's saloon about a half hour before it occurred. Howard and the deceased came in only a few minutes before the shooting. After one or two drinks deceased turned toward Morissey and asked for a light of a cigarette and that it was when Kelleher shot him. Deceased was not facing Kelleher, but was facing Morissey when he was shot. Kelleher did not say anything. Deceased ran past me and out the door on 22nd street and Kelleher after him with a pistol in his hand: He returned and stood in the room a few minutes and then he and McTague left as the police came. After the shooting I saw a hole in the front of the bar about two feet below the top.

Cross-Examination: Sellinger, Morissey, Kelleher and I were at different places drinking that night. I had ten or fifteen bottles of Budweiser. We were in Walsh's about a half hour before the shooting took place. It did not occur a very short while after we got there. We had three of four drinks in there before Howard and deceased came in. We were all drinking heavily. I testified before the grand jury as to this shooting, and I swore that as we entered the saloon I took Morissey into the water-closet and let him vomit, and we were in there when the shooting occurred and saw nothing of it. I testified falsely. I would have said anything to protect him; I would not swear anything to protect myself or to get myself out of the penitentiary. I hope to get out of the penitentiary, but I am not sure of it. Mr. Sager promised me that if I would treat him right he would treat me right; he promised me that he would help to get me out and I hope to get

out. I expect to get out by reason of giving my testimony here. At the former trial of Kelleher I was a witness and swore to the same that I have stated I swore before the grand jury. I was indicted for perjury and on my trial I swore again that at the time of the shooting Morissey and I were in the water-closet and saw nothing of it. As the deceased and Kelleher ran toward the back door, McTague came in and said, "Look out, Eddie, don't shoot me." I saw nobody run toward the rear door except Sullivan and Kelleher. McTague was there just after the shooting, but I did not see him before. I was standing with my face east, and I did not notice who may have passed in the door behind me. I did not see two or three persons standing back near the music box. Nothing was said or done before the first shot was fired to cause deceased to jump back, and he was standing still, getting a light from Morissey's cigarette at the time said shot was fired. Sellinger looked over the swinging door and said, "Here come the cops," and then the defendant and McTague left. The balance of us remained and were arrested. My business was singing at wine rooms in the tenderloin district which were the resorts of fast women, and I lived with one of them in that district. My picture has been in the rogue's gallery eight or ten years.

Re-Direct-Examination: I was indicted for perjury committed before the grand jury during its investigation of this shooting when I swore that I was not at Morgan's saloon with Kelleher, Morissey and Sellinger, and that I was in the water-closet with Morissey who was sick when the shooting occurred, and saw nothing of it. After the shooting I saw Sellinger put his gun on the music box. I did not see McTague pick the gun up from the floor and put it on the music box.

Herman Sellinger, the next witness for the State, substantially stated that: In January and February, 1905, I was conducting a saloon at 2028 Olive Street.

I have known the defendant about seven years. I went from my place of business to Walsh's saloon, and afterwards Morissey, Taylor, the defendant and I went in there, and just a minute afterwards Howard and the deceased came in and walked up to the bar and stood to my left. Soon afterwards some shots were fired and I ran to the rear. I did not see and don't know who fired the shots, and I did not see anybody with a gun. I afterwards saw where one shot was fired into the face of the bar. I looked for the bullet hole because I did not know but what somebody was shooting at me. I did not see Kelleher with a gun at any time that night. I was drinking and if I grabbed a gun in Kelleher's hand I don't know about it. I don't remember to have seen McTague in there at all. Kelleher ran out of the front door after the shots were fired and I did not see him in the saloon afterwards. He was not in there after I ran to the rear of the saloon and returned in a very short while. He did not go to the rear of the saloon and did not pass out by me or through the rear door. Sullivan ran out of the rear door on 22nd street. I think Taylor and Morissey also ran to the rear, and Gerwitz, the barkeeper, laid down under the bar. After I returned from the rear, Taylor and Morissey and the bartender and the porter were the only ones there and shortly afterwards we were all arrested and taken to the hospital to be identified and then to the jail. I was a witness before the grand jury and also at the former trial of this case, and I am now under an indictment for perjury.

Cross-Examination: I had been drinking very heavily that night and I don't really know what did take place before the shots were fired. I did not see whether Morissey and Taylor had gone back to the rear of the saloon or to the water-closet before the shots were fired, or not. "We all went in together and the trouble happened within a minute." By "we"

I mean Kelleher, Morissey, Taylor and myself, and then within a minute Howard and the deceased came in.

Re-Direct-Examination: I went into Walsh's saloon first alone and met Morissey, Taylor and Kelleher, and left there and went to Daneri's saloon about 12 o'clock and from there to Morgan's and then went back to Walsh's about two o'clock.

John Hoffman testified: I am sergeant of police of St. Louis. I went to the saloon where the shooting occurred about 5 o'clock in the morning. I saw a bullet hole in the counter about 2 inches from the top and about midway the length. The bar runs north and south and the bullet appeared to have been fired from the southwest. I found the pistol on top of the music box which was about 7 feet high. That looks like the gun. It was loaded and I turned it over to Officer Cantillion. I assisted in arresting the defendant at 2627 Locust Street, Walsh's residence, about half past nine in the morning of the shooting. When I entered his room he was dressing, another officer having preceded me, and McTague was lying in bed. We took the defendant to the hospital in the presence of the deceased. The deceased made a statement and the defendant said, "I don't know the man, never saw him in my life before."

Cross-Examination: I don't remember that I stated before the coroner at the inquest that the only statement I got from the defendant was in the wagon on the way to the hospital. The defendant never made any statement to me but once, and that was at the hospital. I don't remember that on the former trial of this case I stated that I asked the deceased on the way from the hospital to the holdover, what he had to say to what Sullivan had stated in his presence at the hospital. I saw the gun handle sticking over the edge of the music box and took it down by tip-toeing. I could not see on top of the music box.

William McDonald testified: I am a member of the police force and know the defendant. I was notified of the shooting soon after it occurred and I went to Bumberry's saloon on Pine street and there saw the deceased. He had a gunshot wound in the stomach. I don't remember that he said anything at Bumberry's saloon or on the way to the hospital about his condition or his chances of recovery.

Cross-Examination: Bumberry's saloon is about the middle of the block between 22nd and 23rd streets. I saw the deceased there about three o'clock in the morning. I went to the saloon where the shooting occurred and saw where a bullet entered the counter and splintered it up a little below the top of the bar. A large crowd gathered at Bumberry's and I don't know whether Al Hamilton was there or not.

The witness was recalled by the prosecution and stated that since leaving the stand he had read his testimony given at the former trial and by refreshing his memory he could state that the deceased at Bumberry's saloon said that he thought it was all off with him.

Michael O'Brien testified: I am on the metropolitan police force and am a stenographer. On January 31st, 1905, I took the ante-mortem statement of the deceased at the City Hospital in shorthand and after reducing it to typewriting it was read over to the deceased and he signed it. Said dying statement was read in evidence and was to the effect that the deceased knew that he was dangerously injured and was liable to die; that about 3 o'clock in the morning he and Howard met at 21st and Chestnut streets, and from there went to Daneri's saloon at 22nd and Chestnut streets where they remained about three-quarters of an hour and had about three drinks of whiskey there, and from Daneri's they went to Walsh's saloon at Howard's suggestion, and there he saw Kelleher who shot him. That he and Howard walked to the middle of the bar

and ordered drinks and Kelleher said, "Did you come out here looking for trouble," and then he pulled out his revolver and shot him. He shot twice and deceased was shot in the stomach. He was standing against the bar and looked around when Kelleher first shot and then turned and ran toward the back door. He was shot before he started running.

Herman Sellinger (recalled) testified: I had a revolver with me the night deceased was shot, and after the shooting I put it on top of the music box. I could not say who was present at the time that I did this.

Cross-Examination: I put the revolver on the music box a minute or so after the shooting and as soon as I walked back into the saloon from the rear thereof. I would not say that this is the revolver, but it looks like it. I had a partner named Cullen in the saloon business at 2028 Olive Street. The revolver was one that was kept in the saloon and may have belonged to Cullen and was the only revolver there that I knew about. I lived with a woman named Gene Rogers, who, according to the newspapers, was a notorious panel worker and thief. I have been living in the tenderloin district for about three years. I don't know whether I testified before the grand jury or not that I was in the water-closet when the shooting occurred. I was indicted for perjury before the grand jury. I was so drunk at the time of the shooting that I have a faint recollection of what occurred. I testified as a witness for the State at the former trial of this case and I did not at that time say anything about having put this pistol on the top of the music box, because I was not asked about it. I cannot say whether or not I will be prosecuted on the perjury indictment. At the former trial I said that I had a pistol that night, and that was the only question asked me about a pistol and I never told anybody anything about it until I was arrested and brought back from Chicago on this per-

jury charge and then I told the circuit attorney about the pistol.

The evidence upon the part of the defendant, as developed at the trial, was in substance, about as follows:

Dr. Henry Lloyd testified: I have been deputy coroner of the city of St. Louis for over three years and was coroner for one term, and I conducted the inquest on the body of the deceased, Thomas Sullivan. At the inquest, the witness, John Howard, in illustrating the motion made by the deceased when he jumped back from the bar, threw his right hand back towards his hip pocket. In his testimony before the coroner, Howard did not state that the defendant used any epithet toward the deceased on the occasion of the shooting.

William Winters testified: I am in the saloon business for about nine months. In January, 1905, I was barkeeper for John Shannon at 11th and Chestnut streets; I had been working for him for about two years. The deceased was in that saloon nearly every night. I recall the fact that deceased was shot one night in Walsh's saloon, and that he was in Shannon's saloon about 4 or 5 o'clock the preceding morning. He was standing in front of the bar having several drinks, and was talking about going and getting one of them "sons of bitches," Kelleher or Taylor. Shortly afterwards he displayed a revolver and wanted to shoot it off in the saloon.

Cross-Examination: I understood from parties at the saloon that a fight had occurred there two or three days before in which Kelleher and deceased were engaged in the wine room of Shannon's saloon. When I asked him what "sons of bitches" he referred to, he said, Kelleher or Taylor. It was a black gun that he displayed. I was not at the saloon when the fight in which Kelleher and the deceased were engaged,

took place; it occurred in the afternoon when I was not on watch.

Beverly Brown testified: I am in the employ of the city as rodman with the surveyor in the Street Department. I knew Sullivan, the deceased, ten or twelve years, intimately. At about ten o'clock on the night of the shooting I walked with him up Chestnut street towards Howard's saloon, and he told me about some trouble he had in a saloon at 11th and Chestnut streets a few days before, and he said that he was going up to Walsh's and get even with Eddie Kelleher and that bunch, and asked me to go with him and I told him I did not want to go up. He said he wanted to get a few drinks first. He displayed a revolver and said, "We will go up and get them," and I says, "I don't want to go up. I declined the invitation."

Cross-Examination: I don't know how often I have been arrested on charges in the police court. The gun deceased displayed to me was black. The deceased was in the habit of carrying a pistol continually. I have seen him with a pistol lots of times.

Michael Ryan testified: I am a carriage driver, and in January, 1905, I had a stand at 19th and Chestnut streets at the southwest corner at Howard's saloon. I heard of the shooting of the deceased, Thomas Sullivan, the same morning that it happened. He was shot at Walsh's saloon at the corner of 22nd and Pine streets. I saw him about one o'clock the same night that he was shot. He was drinking and he wanted to hire my carriage to go up to Manly's saloon and from there to Walsh's saloon, and said he "wanted to get Kelleher." I told him I was engaged, but I was not. I don't know whether he had a pistol that night, but I saw him display a pistol a short time before that when I had him and a man by the name of Brown and they talked about beating some man up in his room. I was hauling them from 11th and Chestnut up to 19th and Chestnut streets.

Cross-Examination: The man whom I hauled with the deceased was Beverly Brown, the witness in this case, and it was about a couple of weeks before the shooting, or it may have been longer; I know it was not very long before the shooting happened. I served a term in the penitentiary for larceny eleven years ago, and have never been arrested since. I work at Eckert's stable.

Al Hamilton testified: I am a cigar salesman. I heard of the shooting of deceased shortly after it occurred and I went to Bumberry's saloon where he was. I knew Sullivan well for about five years. He roomed with me once for about two or three months. I stooped over him and had a talk with him as he lay on a cot in Bumberry's saloon, and I asked him how he got shot, and he said, "Well, they beat me to it." I afterwards went to Walsh's saloon and Officer Vollmer put me in charge of the place after arresting the parties therefrom.

Cross-Examination: I afterwards examined the bar where the bullet had struck and one of them found a revolver on top of the music box. I have been arrested but was acquitted.

Officer Theodore Vollmer testified: I am in the undertaking business and was on the police force January, 1905. Being notified of the shooting I went to Bumberry's saloon, where the deceased was lying on a cot, and thence to Walsh's saloon, where the shooting had occurred, and there arrested Sellinger, Morissey and Taylor. At an early hour on the same night, I was called to Morgan's saloon, and found Sellinger, Taylor, Morissey and Kelleher in there. I searched both Sellinger and Kelleher for pistols and did not find any on them.

John Cullen testified: I am in the cigar business now. In January, 1905, Herman Sellinger and I were in the saloon business together at 2028 Olive street.

I remember the night that Thomas Sullivan was shot; I heard of it the next day. There was only one revolver kept at our place of business at 2028 Olive street, and it is my own revolver and I have it now in my trunk at my residence.

John J. Noonan testified: I am sergeant of police. I have known the deceased eight years and once had occasion to arrest him on a charge of "holding up" a young man. The reputation of deceased for general morality was bad.

J. R. Shipp testified: I am in the saloon business and was formerly on the police force up to the 10th of January, 1906; have been on the force for about five years. I knew deceased around the corners of the beat that I walked, and knew him quite well, and ran him off my beat several times. His general reputation was bad.

Thomas E. McTague testified: I came from New Orleans, where my mother lived, to St. Louis about five years ago. In January, 1905, I lived at 2629 Locust street at a rooming house, the same place that Mike Walsh lived, and I had been, "off and on," barkeeper for Mike Walsh. The defendant also was a barkeeper for Walsh. On the night of January 29, 1905, I entered Walsh's saloon between 2 and 2:30 in the morning, by front door on 22d and Pine streets. There was also a rear door to the saloon on 22d street. Just as I entered the saloon I noticed Eddie Kelleher, Herman Sellinger, John Howard and Tommy Sullivan standing at the bar: Kelleher was at the south end of the bar, Sellinger was next to him, Howard was next to Sellinger and Sullivan was next to Howard. As I entered I heard a remark passed and Sullivan replied, "Yes, God damn you," and just then I had about reached a music box which stood against the west wall of the saloon and about opposite the middle of the bar. Then Sullivan made an effort to draw his gun and Kelleher stepped out and shot at Sullivan and

Sullivan dropped his revolver and ran out the back door to 22d street. Sullivan jumped back from the bar and Kelleher stepped out and fired two shots. Sullivan had his revolver partly out, and whether entirely out or not, anyhow when the shots were fired he dropped it. Sellinger also went to the rear of the saloon and staggered back; he was very drunk. Howard ran out the front door and Kelleher also. I stood there for a moment and picked up the revolver from the floor and put it on top of the music box and then walked out of the saloon by the front door. This music box had around it a sort of cap or moulding. I did not enter the rear door of that saloon that night nor did I meet Kelleher chasing Sullivan. I walked north on 22d street to Olive street and overtook the defendant near 23d street, and took him home with me to 2629 Locust street, and the next morning between 9 and 10 o'clock the officers arrested him and left me in bed. The officers asked me my name and I told them. I did not see either Taylor or Morissey the night of the shooting.

Cross-Examination: I was standing at the south side of the music box and Sullivan was to the north of me and near the water-closet. There was nobody beyond or north of him. Kelleher was south of him near the partition. Sullivan and Kelleher stepped out from the bar about the same distance. I did not testify at the coroner's inquest; I was not subpoenaed. I testified at the former trial of Kelleher to the same statement I am now testifying. I did not testify at the trial of Taylor or Morissey. Gussie Groves, Mike Walsh's woman, is notorious. I room there and pay my rent. I held a position as street inspector under the city until about a year ago. Walsh's saloon was resorted to by bad characters. I am not married, have no wife in New Orleans, nor was I ever married in Illinois. I was on my way home when I stopped in Walsh's saloon the night of the shooting. I don't

drink, as a rule, but I knew the boys there. After the remark was passed which I did not understand, Sullivan said, "Yes, God damn you," and then went back for his gun and Kelleher pulled out his and fired. Sullivan started to pull his gun before he backed away from the bar. Kelleher said this is no place to come looking for trouble. The shooting occurred possibly a minute after I entered the saloon. Sullivan made an attempt to draw his revolver before Kelleher drew his. I did not know whether there was any other revolver on top of the music box; I did not see any. I do not know what Kelleher did with his gun after the shooting, I did not see it afterwards. I was convicted in the police court of idling and was discharged on appeal. I said on the last trial that Sullivan drew his pistol and illustrated how he had his hand and that and what I have stated on this trial are true.

Re-direct Examination: At the time Sullivan went back for his gun, Kelleher had made no effort to draw his revolver. Sullivan was the first one to go back for his gun. I was never arrested in my life before the time of this shooting. The arrest referred to by me occurred since then.

In addition to the testimony, as herein indicated, the State introduced Dr. J. A. Hartman and Dr. John Young Brown, both of whom fully testified as to the nature and character of the wound, and that the death of Sullivan was the result of the gunshot wound.

This is a sufficient indication of the nature and character of the testimony upon which this cause was submitted to the jury. The testimony developed upon the trial, as well as the objections interposed by counsel for the defendant, will be alluded to and given careful attention during the course of the opinion.

At the close of the evidence the court instructed the jury upon murder of the first and second degrees and self-defense, and also covered by appropriate instructions all the other subjects to which the testimony

was applicable. It is not essential to burden this opinion with a reproduction of the instructions. Whatever attention may be necessary to give them will be given during the course of the consideration of the legal propositions presented by the record.

The cause was submitted to the jury upon the testimony as developed and the instructions of the court, and they returned their verdict finding the defendant guilty of murder in the second degree, and assessing his punishment at fifteen years' imprisonment in the penitentiary. Timely motions for a new trial and in arrest of judgment were filed, and, by the court, overruled. The defendant was duly sentenced in accordance with the verdict, and judgment and sentence duly entered of record. From this judgment this appeal was prosecuted, and the record is now before us for consideration.

## OPINION.

The record in this case discloses the assignment of numerous complaints of error as a basis for the reversal of this judgment. We will give to the complaints of the appellant such consideration as in our opinion their importance requires.

### I.

The most serious proposition presented by the record with which we are confronted, is the assignment of error upon the part of the trial court in the admission, over the objections of the defendant, of certain portions of the dying declaration made by Thomas Sullivan, the deceased. The declaration of which complaint is made and to which timely exceptions were preserved, was in the form of answers by the deceased to certain interrogations propounded. To fully appreciate this proposition it is essential that we reproduce such portions of the dying declaration of

Sullivan to which objections were interposed. Embraced in the dying declaration introduced in evidence by the State was the following:

"Q. Where did you meet Johnnie Howard? A. 21st and Chestnut street. (Objected to by defendant as not being a part of *res gestae* and immaterial. Objection overruled and exception saved.)

"Q. Where did you go then? A. We went to Joe Daneri's, 22d and Chestnut streets. (Objected to by defendant as not being a part of *res gestae* and immaterial. Objection overruled and exception saved.)

"Q. How long did you stay in Daneri's? A. About three quarters of an hour. (Objected to by defendant as not being a part of *res gestae* and immaterial. Objection overruled and exception saved.)

"Q. Did you have any drinks while in there? A. Yes, sir. (Objected to by defendant as not being a part of *res gestae* and immaterial. Objection overruled and exception saved.)

"Q. About how many? A. Three, I believe. (Objected to by defendant as not being part of *res gestae* and immaterial. Objection overruled and exception saved.)

"Q. Was it beer or whiskey? A. Whiskey. (Objected to by defendant as not being a part of *res gestae* and immaterial. Objection overruled and exception saved.)

"Q. Where did you go from Daneri's? A. Over to Walsh's. Johnnie says, 'Let's go in and get a drink.' (Objected to by defendant as not being a part of *res gestae* and immaterial. Objection overruled and exception saved.)

"Q. Where did he say that? A. When we got opposite Walsh's. (Objected to by defendant as not being part of *res gestae* and immaterial. Objection overruled and exception saved.)"

That the declarations as herein indicated, to which objections were interposed, related to matters occur-

ring anterior to the killing and not immediately connected with it, in our opinion, is too plain for discussion. They in no way had reference to any facts or circumstances constituting the *res gestae* of the homicide, but were the narration of certain incidents which occurred anterior to the fatal encounter.

The proposition now under consideration was sharply presented to this court in State v. Parker, 172 Mo. 191. In that case, as in the case at bar, objections were interposed to certain portions of the dying declaration, and this court, speaking through Judge GANTT, very clearly and correctly announced the well settled rules applicable to the admission of dying declarations. In treating of the proposition in that case, it was said:

"We are thus brought to the objection that portions of this statement were incompetent because it was not confined and restricted to the identification of the accused and the deceased and to the act of killing and the circumstances immediately attending said act and forming a part of the *res gestae.*

"Dying declarations are admissible as to those facts and circumstances constituting the *res gestae* of the homicide, but as to all other matters occurring anterior to the killing and not immediately connected with it, they are incompetent. This is the settled law of this State. [State v. Draper, 65 Mo. l. c. 340, and cases cited; State v. Vansant, 80 Mo. l. c. 76; State v. Bowles, 146 Mo. l. c. 16; 1 Greenleaf on Ev., sec. 156; State v. Parker, 96 Mo. l. c. 392.]

"The portions of the statement to which defendant objected, outside of those excluded by the court and included within brackets, are the following: 'I never made any threats against him in my life.' The State by its counsel conceded that the words 'in my life' should be stricken out and the defendant objected to striking out those words without striking out the whole of that sentence.

"We think the court erred in not striking out the whole of said sentence. It necessarily referred to matters anterior to the fatal encounter, was not a part of the *res gestae* and under the rule just announced was inadmissible. It cannot be said that it was harmless as it tended directly to disprove the evidence of the defendant's witnesses that deceased had made threats of violence toward defendant and they had been communicated to defendant.

"Other parts of the statement to which exception was taken, were: 'I had not touched a drop of liquor for over a month;' 'I know of no reason why he shot me, except as above stated;' 'I did not think he was going to shoot me, as I had never given him any cause to shoot me;' 'I had never had a quarrel with him.'

"Each of these statements are subject to the same objection as the one above noted. They do not purport on their face to be statements of any facts which occurred at the killing. They refer either to the absence of threats anterior to the homicide or the conclusions drawn by deceased that defendant had no cause to shoot him. We think they should likewise have been excluded. [State v. Elkins, 101 Mo. 344.]"

With equal clearness, Judge BURGESS, in this case upon the former appeal, exhaustively reviewed the authorities upon the subject of dying declarations which related to facts and circumstances occurring subsequent to the fatal difficulty, and expressly held that such facts did not constitute any part of the *res gestae*, and therefore were inadmissible. The same rule which was so clearly pointed out as to facts and circumstances occurring subsequent to the killing, applies with equal force to the facts and circumstances occurring anterior to the fatal difficulty, which are not immediately connected with and forming a part of the *res gestae*.

It must not be overlooked that the learned trial judge was not in any way misled, either by the action

of counsel for the defendant or the action of this court upon the former appeal. Upon this second trial learned counsel for appellant interposed clearly and specifically his objections to the introduction of certain portions of the dying declaration, which were by the court over-ruled and exceptions timely preserved. Emphasizing the fact that the trial court admitted the objectionable portions of the dying declaration upon' an erroneous view of the law, we find that during the progress of the trial the court gave expression to its views as to what a dying declaration might contain. This expression was made concerning the testimony of the witness Al Hamilton, when a discussion between the court and counsel occurred concerning this proposition. The remarks between counsel and the court as disclosed by the record, were as follows:

"Mr. Harvey: It was objected to as not being a part of the dying declaration proper. In the dying declaration you cannot give anything except the facts immediately connected with the alleged homicide.

"The Court: Anything he testified to in his dying statement.

"Mr. Harvey: I wish to state, as I understand the ruling about a dying declaration, they can contain only such things as grew immediately out of, or occurred with the alleged shooting or killing. Anything that occurred before that, or afterwards, the dying declaration could not contain; it is confined to what occurred at the time, and arose immediately out of it.

"The Court: It may contain anything the dying party might have testified to, both before and after the transaction."

Upon the complaints of the appellant as to the admission of the portions of the dying declaration as heretofore indicated, the learned Attorney-General submits two propositions:

First: That the opinion by this court upon the former appeal based upon the *ante-mortem* statement

is *res adjudicata,* and the point is not open for further review.

Second: That the questions and answers of the *ante-mortem* statement objected to by the appellant do not in any way violate the rule as laid down in the cases of State v. Draper, 65 Mo. 335; and State v. Bowles, 146 Mo. 6.

After a most careful consideration of the propositions so ably presented by the Attorney-General, we are unable to give our assent to the correctness of either insistence. While it is true that the declarations now under consideration upon this second trial were embraced in the record upon the former appeal, but manifestly an examination of the opinion will demonstrate that the question as to the competency of such declarations was not passed upon by this court, for the reason that they were not in judgment before the court. Counsel for appellant, upon the former appeal, did not embrace the dying declarations now under consideration among those to which he interposed an objection; hence Judge BURGESS in treating of the question as to the admissibility of dying declarations, correctly directed his attention only to those to which an objection had been interposed. The dying declarations involved in this proceeding were not discussed, and of course were not erroneously admitted in that case, for the reason that they went in without objection.

We know of no rule which would preclude a defendant on a second trial from interposing objections to testimony which was admitted upon a former trial without any objection. It often occurs in the trial of causes that instructions are given as well as evidence introduced to which no objection is made, and this court in disposing of the case would not give any attention to such instructions or to such evidence, for the reason it was not before the court for review; but upon some subsequent trial where the same instructions were given and the same evidence introduced, to which clear

and specific objections were interposed, manifestly the instructions and the evidence in that case, upon appeal to this court, would be subject to review, and if the action of the court was found to be erroneous, the court would so declare. The mere fact that a proposition was embraced within the record, but was not a subject of review, for the reason that no objections had been interposed in the trial court, in our opinion, would not be *res adjudicata* of that proposition.

It often happens in the trial of important cases that learned and able counsel, being confronted with so many complicated questions, may fail to timely interpose an objection to certain testimony or to certain instructions given in the cause. As in the case at bar, the dying declarations offered in evidence by the State were quite lengthy and consisted of questions and answers by the deceased. In going over such questions and answers counsel failed to make his objections to certain portions of them, but did not make objections to other portions of the dying declaration, and by reason of the admission of the portions to which objections were interposed, the judgment in the case was reversed and the cause remanded, and a second trial had. This second trial was separate and independent of the first. All of the facts essential to establish the guilt of the defendant had to again be developed by the State, as well as all matters of defense by the defendant had to be again introduced at that trial, and in our opinion it cannot be seriously contended that the defendant did not have the right to interpose objections to any portion of the testimony which may have been introduced in the former trial without any objection, and the mere fact that this court upon the former appeal did not treat of the admissibility of certain evidence, for the reason that it was not subject to review, and was admissible on the ground that the testimony went in without any objection, should not be held as *res judicata* of the question as to the admissibility of such evidence

to which clear and specific objections were interposed upon the second trial.

Recurring to the second proposition insisted upon by the learned Attorney-General, that is, that the *ante-mortem* statement objected to by appellant does not in any way violate the rule as laid down in the cases heretofore indicated, we will say that the portions of the dying declaration to which timely objections and exceptions were made, are fully set forth herein, and in our opinion they furnish a full and complete answer to the question as to whether or not such declarations related to matters and incidents occurring anterior to the killing and not immediately connected with it. The answers and questions embraced in the dying declarations show beyond dispute that they had reference to matters which occurred anterior to the killing, which were not immediately connected with it, and for that reason such declarations formed no part of the *res gestae* of the homicide.

It does not furnish a sufficient or satisfactory answer to the complaint urged by appellant that the dying declarations as herein indicated were not admissible, to say that they were harmless. It may be said that a number of the questions and answers embraced in the dying declaration concerning the different saloons visited and the number of drinks taken, and the character and class of drinks, were not of very much importance, yet they might, however, be used by the State to some extent for the purpose of corroboration of one of the leading witnesses against defendant, John Howard; but when we reach the questions and answers in the dying declarations wherein the deceased states in substance that he went into Walsh's saloon at the solicitation of John Howard for the purpose of getting a drink, and that this suggestion was made before they entered the saloon of Walsh—in other words, as stated in the declaration that this suggestion was made "when we got opposite Walsh's," it presents a statement which

could be used and doubtless was used in the discussion
of the testimony before the jury in the trial of this
cause, of great force and vital importance. Analyzing
the force and effect of this statement, it simply amounts
to a declaration by the deceased that he went into
Walsh's saloon, not upon his own volition, but at the
suggestion of his companion John Howard, and that he
went in there, not with the view of finding the defend-
ant, Kelleher, or in any way seeking a difficulty with
him, and that his only purpose in going in was to com-
ply with the suggestion of his companion, John How-
ard, and for the innocent purpose of taking a drink.
This declaration was of vital importance for the State;
its tendency was to directly contradict the testimony of
the witness Beverly Brown, who testified that about
10 or 10:30 p. m. on the night of the shooting, the de-
ceased displayed a pistol and said that "he was going
up to Walsh's and get even with Eddie Kelleher and
that bunch," and requested Brown to go with him,
which invitation was declined. Brown's testimony fur-
ther emphasized this threat to go to Walsh's saloon to
get even with Kelleher, by stating upon cross-examina-
tion that the deceased referred to a difficulty with the
defendant a few days previous at Shannon's saloon.
Equally does it tend to contradict the force and effect
of the testimony of Michael Ryan, who testified that
about one o'clock on the night of the shooting the de-
ceased tried to hire this witness who was a carriage
driver, to take him to Manley's saloon and thence to
Walsh's saloon; "that he wanted to get Kelleher."
This witness also declined to aid deceased in the execu-
tion of his intention to go to Manley's and Walsh's sa-
loons as designated. There was other testimony of a
similar character by witness Winters as to threats
made by the deceased on the morning of the day pre-
ceding the shooting.

　　This testimony as introduced by the defendant
could be used and doubtless was used in the discussion

of the facts before a jury to show that the deceased had fully made up his mind, even up to within an hour before the shooting to go to Walsh's saloon, and that when he did go it was of his own volition and not for the inoffensive purpose of complying with the suggestion of his companion, John Howard, to go into the saloon merely to get a drink.  This testimony as introduced by the defendant could also be used with great force in leading the jury to the conclusion that the deceased, in keeping with his previous declarations to witnesses Brown, Ryan and Winters, sought Walsh's saloon and entered there for the purpose of finding the defendant and renewing the difficulty in which they had been engaged at Shannon's saloon.  It is apparent that the dying declaration, to which reference has been made, and which was made anterior to the fatal difficulty would have a very strong tendency to lessen the force and effect of the testimony of the witnesses concerning the threats of the deceased to go to Walsh's saloon for the purpose, as the deceased expressed it, of "getting Kelleher," the defendant.

We have carefully analyzed the Parker case, heretofore referred to, and we are unable to distinguish the force and effect of the dying declarations which were erroneously admitted in the case at bar, and the testimony in that case which was held to be incompetent and inadmissible.  The portion of the statement in the Parker case which was introduced as a dying declaration, embraced the following:  "I never made any threats against him in my life."  This court held that the trial court erred in not striking out the whole of that sentence, and in assigning a reason for such holding it was said that the declaration could not be treated as being harmless, as it tended to directly disprove the evidence of defendant's witnesses that deceased had made threats of violence toward the defendant.  So we say in the case at bar, that the dying declaration introduced in evidence which was anterior to the time of the

fatal encounter, that the deceased went into Walsh's saloon upon the suggestion of his companion, John Howard, for the mere purpose of getting a drink, also tends with equal force of the declaration made in the Parker case, directly to disprove the testimony of two or three witnesses concerning the avowed purpose of going to Walsh's saloon for the purpose of seeking Kelleher and "getting even with him and that bunch."

We see no necessity for pursuing this subject any further. If the Parker case announced the correct rule, and we see no legal valid reason for departing from it, concerning the declarations sought to be introduced in that case, then we see no escape from the conclusion in the case at bar that the learned trial court erroneously and improperly admitted the declaration to which we have referred.

## II.

It is insisted by appellant that William Taylor, commonly known as "Buck" Taylor, who testified in this cause against the defendant, was incompetent as a witness. This witness was convicted and sentenced to seven years in the penitentiary for perjury, and while serving said term of imprisonment he was brought from the penitentiary by a guard and introduced as a witness by the prosecution in this cause. The defendant, through his counsel, upon the facts being developed that this witness was serving a sentence in the penitentiary, and was in attendance upon court unlawfully and without any authority of law, interposed an objection to his competency, which objection was overruled and a timely exception preserved.

It is sufficient to say of this proposition that it is conceded by counsel for appellant and respondent that this witness has been pardoned and is now not an inmate of the penitentiary, therefore upon the retrial of this cause the grounds urged in the case at bar as to his incompetency, will not be in existence, his term of ser-

vice in the penitentiary will have expired by reason of the pardon, therefore under the provisions of the statute he would be a competent witness, and the determination of this proposition would serve no purpose, as applicable to this case, as a guide to the lower court in the retrial of it; hence we express no opinion uopn this proposition.

## III.

It is next insisted that the court committed error in its refusal of the second and third instructions requested by the defendant on the subject of imperfect self-defense. It is only necessary to say upon that proposition that the leading features of the testimony in the case at bar are substantially the same as disclosed by the record upon the former appeal. Judge BURGESS fully treated of the propriety of similar instructions in the disposition of the case upon the former hearing. In our opinion the question as to the propriety of those instructions was correctly determined in that case, and we see no legal valid reason for departing from the conclusions therein reached.

## IV.

We have indicated our views upon the leading propositions disclosed by the record, and it is sufficient to say of the other complaints made by appellant, to which we have given consideration, that they are insufficient to warrant this court in reversing the judgment. For the errors as herein pointed out, the judgment of the trial court should be reversed and the cause remanded. It is so ordered.

All concur.