## WILLIAM HAWKINS v. STATE.

No. A.-4042.    Opinion Filed June 30, 1923.
(216 Pac. 166.)

(Syllabus.)

1.  **Homicide—Evidence Sustaining Conviction for Murder.** For evidence held sufficient to support the verdict and judgment, see statement of case and body of opinion.

2.  **Appeal and Error—Harmless Error—Exclusion of Evidence Otherwise Proved.** The exclusion of evidence to prove particular facts is not prejudicial, if the facts sought to be proved are otherwise proved by competent evidence, and it is apparent that the evidence excluded would not have changed the result.

3.  **Trial—Refusal of Requested Instruction Where Case Covered in Charge.** Where the instructions given fairly and fully cover the law of the case, it is not error to refuse requested instructions.

4.  **Jury—Procedure Where, Before Testimony Taken, Juror Becomes Sick and Unable to Perform Duties.** If, before any testimony is taken, a juror becomes sick so as to be unable to perform his duties, the court may order him to be discharged and a new juror sworn in his place. In such event it is not mandatory that the entire jury be discharged and a new jury impaneled.

5.  **Trial—Keeping Jury Together Three Days, and Admonition Held not Coercion of Verdict.** Keeping the jury together from Saturday night until the following Wednesday morning, to consider of their verdict in a murder case, is not an unreasonable length of time, and the further facts that in the interim the trial court cautioned the jury that they should reason together among themselves and arrive at a verdict if possible do not together amount to acts coercing a verdict.

Appeal from District Court, Ottawa County; S. C. Fullerton, Judge.

William Hawkins was convicted of murder, and he appeals. Affirmed.

On the 20th day of August, 1920, an information was filed in the district court of Ottawa county, jointly charging William Smith, alias William Hawkins, C. B. Wood, and Joe J. Lynch with the crime of murder, alleged to have been committed in said county on the 1st day of June, 1920, by shooting one

O. B. Vanderpool with a revolver. A severance was granted, and the defendant Hawkins was tried in February, 1921; the jury returning into open court on the 9th day of February, 1921, a verdict finding the defendant Williams Hawkins guilty of murder and assessing his punishment at imprisonment in the state penitentiary for life at hard labor.

Motion for a new trial was filed, heard, and overruled, and on the 19th day of February, 1921, judgment was rendered against the defendant, and defendant sentenced to life imprisonment in accordance with the verdict. In due time and by proper proceedings an appeal was taken to this court by filing herein, on the 8th day of August, 1921, petition in error with case-made attached.

The petition in error contains 28 separate assignments of error, some of which involve the sufficiency of the evidence to sustain the verdict and judgment. It will be necessary, therefore, to include herein a somewhat extended statement of the facts.

It was the theory of the state that the killing of Vanderpool was the outgrowth of an unsuccessful attempt on the part of this defendant and of his codefendants to resist and escape from arrest by the deceased, Vanderpool, and certain other officers and persons who had them in custody at the time of the commission of this homicide. The defendant did not become a witness in his own behalf. It is the theory of counsel who represent him in this court that the state wholly failed to make out a case of murder against him; counsel conceding the homicide was the result of an attempted resistance and escape from arrest, yet nevertheless such attempt was solely the independent acts of Joe J. Lynch, committed by said Lynch without consent, connivance, aiding, or abetting on the part of this defendant. In this connection it should be stated at the out-

set that Joe J. Lynch, upon whom this defendant would place entire responsibility for the homicide, was shot by the officers during the perpetration of, and in resistance to, the homicide and later died.

The facts which the trial court permitted the state to prove are substantially as follows: Norris Chandler, also killed, was part owner and manager of the McKinney-Chandler Wholesale Grocery Company, doing business in Miami, Ottawa county, Okla. On the night of May 31, 1920, Chandler, in company with the deceased, O. B. Vanderpool, a detective whom Chandler had employed, and Frank Byrd, an officer, and one Wesley Brown, a private citizen, went to the city of Picher in Ottawa county in an automobile, arriving in Picher a short time before midnight that night. They stationed themselves near the business house of the defendant C. B. Wood, and remained there some little time, when this defendant Hawkins and Joe J. Lynch appeared on the scene driving a Buick automobile. It appears that both Hawkins and Lynch had been former employees of Chandler in the wholesale grocery, and that they were both residents of the city of Miami. Hawkins and Lynch went into the place of business of Wood. Chandler and Vanderpool then went to the front door of Wood's business house, and Byrd went around to the back door or side door and asked to be admitted. A short time afterwards persons were heard coming toward the front door of the business house. They came outside, and these persons were Hawkins and Joe J. Lynch, who had come there together in the Buick automobile. As soon as they were outside of Wood's store, the deceased, Vanderpool, and Chandler attempted to put them under arrest. Some resistance was made by the defendant Hawkins, and Frank Byrd, who was an officer, was called around to assist Vanderpool and Chandler. Byrd asked Chandler if the parties had been searched and received an affirmative reply.

Byrd then started to put the handcuffs on Hawkins and Lynch. Hawkins resisted and stated to Byrd, in substance, that "you know me and that it is not necessary to put handcuffs on me." Byrd replied "that he knew him and that was the reason he was going to handcuff him." There was somewhat of a scuffle between Byrd and this defendant at the time he was hand-cuffed, and during the scuffle a .38 caliber pistol that Byrd had was discharged without injury to anybody, and finally Byrd accomplished his purpose by placing one handcuff over the right wrist of this defendant and the other end of the handcuff over the left wrist of Lynch. Byrd then handed this .38 caliber pistol to Chandler. Wood was also arrested and searched by Byrd but not immediately at the time and place that Hawkins and Lynch were placed under arrest. Wood had no weapon when searched.

After these parties were arrested 11 sacks of sugar, which had at one time been the property of the McKinney-Chandler Wholesale Grocery, were removed from the store of Wood and placed in the rear part of the Buick touring car in which Hawkins and Lynch had driven there that night. The parties then started with their prisoners back to the city of Miami, the county seat, a distance of approximately 12 miles. In return-ing to Miami, Chandler drove the car in which they had gone to Picher and was seated in the front seat on the left side thereof. In the front seat and immediately to Chandler's right was the defendant C. B. Wood. In the rear seat and on the right side thereof was Lynch, and immediately to Lynch's left and handcuffed to his left arm, was this defendant Hawkins, and immediately to Hawkins' left and on the left side of the rear seat sat the deceased Vanderpool. The car driven by Chandler left the city of Picher first and was followed by the Buick car driven by a young man by the name of Hatfield. Frank Byrd occupied the right-hand side of the front seat of

the Buick car, and Wesley Brown sat upon the sacks of sugar in the rear part of the Buick car. In this order the cars proceeded toward Miami; the Chandler car traveling at a distance, varying at times, from 75 to 100 yards in front of the Buick car. In this order the cars arrived at the city of Commerce, which is about halfway between Picher and Miami. When the cars passed through Commerce, between the hours of 1 and 2 o'clock on the morning of June 1, 1920, Byrd hailed Charley Warner, who was chief of police of the city of Commerce, and requested him to get on the car and go to Miami with them. Warner then jumped on the left running board of the rear car.

A short distance south of the city of Commerce was a cave-in or rough and broken place in the road which necessitated the slowing down of the car, and the rear car, which was heavily loaded with sugar, lost quite a distance at this rough place, so that the car driven by Chandler was from 150 to 250 yards ahead of the rear car at that time. About the time the rear car was leaving this rough place or cave-in in the road, shots were heard in the front car, one heavy shot and a slight pause, and then a number of other shots in rapid succession, and immediately the front car was seen to swerve in the road and turn into the road into a ditch along the right side and stop against a small embankment; the rear part of the front car stopping about even with the west side of the traveled road and apparently at an angle of about 45 degrees in a southwest direction. Upon hearing the shots in the front car the speed of the rear car was increased, and the rear car arrived on the scene of the shooting a very short time after the first shooting had subsided. The rear car stopped about 40 feet back in the road and to the north and east of the front car. Warner got out on the east side of the car and Byrd on the west side thereof and started toward the front car. When

they had gotten about even with the front of the rear car and in the reflection of the lights from the rear car, shooting again commenced from the rear end of the front car. This shooting was first directed toward Byrd and then toward Warner. Warner says that shots were fired from both the left and right sides of the rear end of the front car. Byrd testified that he could not tell whether the shots came from both sides of the front car or not. Both agree, however, that the shooting at that time was from pistols of two different calibers, as the first shooting was from a pistol that made a louder report than the later shooting. In a few seconds this shooting ended. At that time Warner was on the east side of the front car and Byrd on the west side thereof. When Byrd reached the west side of the front car Lynch took a couple of shots at him with a .32 automatic revolver that was owned by Byrd, and which had been loaned by Byrd to Vanderpool before the parties were arrested that evening. Lynch at that time was on the east side of the rear end of the front car, which was the left side thereof, and the side that was occupied by Vanderpool when the car left the city of Picher. Hawkins was on the right or west side of the rear part of the front car and had opened the right rear door and was in the act of stepping out of the rear part of the car when Byrd and Warner got up there. Wood, who had been riding in the front seat, had gotten out of the car and was around in front of the car when Byrd and Warner got up there, and immediately surrendered. Wood was unarmed, barefooted, in his shirt sleeves, and without a hat. He was in the same condition as when arrested. Chandler was crouched over the steering wheel and apparently in a dying condition. His feet were practically in the position of one driving the car. A bullet had entered his body just above the right hip pocket and about two inches to the right of the center of the spine. Chandler had also received a second shot.

Vanderpool was found with a bullet hole entrance on the left side of his head and exit under the right arm. Also another bullet had entered his body a little to the right of the breast bone and lodged on the right side and about two inches from where the other bullet had lodged under the armpit. Vanderpool was not yet dead. He was lying down between the back of the front seat and the front of the rear seat, with his feet against the left rear door of the car, and his head and shoulders resting on the cushion of the rear seat near the right rear door of the car. His face was turned toward the left of the car. Hawkins received a wound on the right hand or wrist, and a bullet had hit the handcuffs and so warped and bent them that they could not be unlocked from Lynch's hand. Lynch had received several wounds, and later died from the effects of such wounds. When Lynch was first seen after the shooting he was sitting straddle of Vanderpool's legs. Two pistols were found in the rear part of the  front car,  lying one on top of the other. The top pistol was the .32 automatic which had been loaned by Byrd to Vanderpool, and which Byrd had seen Lynch using when he first arrived at the car. The other pistol was a .45 Colt's automatic which had never been seen by any of the officers prior to the shooting. The .38 caliber pistol which Byrd had loaned to Chandler just before the arrest was afterwards found in the roadway about 75 feet back of where the Chandler car stopped, as near as the officers could estimate the distance. This pistol was found close to the point where the Chandler car was first seen to swerve in the road at the time the shooting commenced, and this pistol was found near the left or east side of the traveled road, and when found had two discharged shells with a loaded shell between them. The .45 automatic pistol that was found in the rear part of the front car had been shot empty. In the top of the front car was also found a bullet hole and one in the rear bow of

the top. One entered the back part of the body under the back fender on the left side, and one right over the back fender on the left side. These were from shots fired by Warner. There was also one in the front lock by the driver's seat and one in the left front door, and a bullet was found under the front seat where the driver sat. A couple of empty shells were also found, and the bullet found in the car was identified and admitted in evidence. Immediately when Warner and Byrd got to the car after the shooting, Vanderpool stated "Lynch is the man who shot me," and Lynch then said: "Yes; I done all the shooting." The bullets removed under the pit of Vanderpool's right arm were both .45 caliber steel jacket. Besides the .45 caliber automatic pistol found in the Chandler car, Warner was also shooting a .45 caliber Colt's automatic. While Byrd was shooting a No. 7 German Lugar, which is about the equivalent of a .32 caliber.

The foregoing statement of the case is approximately correct. A few minor details are omitted, which are not deemed essential to a correct understanding of the facts.

F. W. Church, and Gus Seawel, for plaintiff in error.

George F. Short, Atty. Gen., and N. W. Gore, Asst. Atty. Gen., for the State.

MATSON, P. J. (after stating the facts as above). The first assignment of error presented and urged in the brief relates to the sufficiency of the evidence to sustain the conviction. Under this general assignment counsel have grouped six separate assignments contained in the petition in error, all relating to the general question of the sufficiency of the evidence. It follows, therefore, that, if the evidence is held to be sufficient to sustain the verdict and judgment, the assignments thus grouped under this head are each held to be without merit, without further reference thereto in this opinion.

As heretofore stated, counsel contend that the evidence is wholly insufficient to sustain the verdict and judgment, because the state relied upon circumstantial evidence, and the circumstances are not wholly inconsistent with innocence, and are explainable upon the hypothesis of defendant's innocence.

We are unable to agree with the proposition that the evidence is insufficient. Counsel for this defendant have presented an elaborate, extensive, and able brief, which contains a very adroit line of argument in an attempt to persuade this court that this judgment should be reversed upon the foregoing ground alone, but, giving due consideration to the argument presented, we cannot agree with the conclusion that the facts and circumstances in evidence in this case are logically capable of explanation on any theory consistent with defendant's innocence.

Indeed we are convinced from an examination of this record that the trial court, out of an abundance of caution, and to the prejudice of the state, confined the limits of the state's proof to such an extent as to materially prejudice the state's case.

We are convinced that there were two theories upon which this case should have been submitted. Instead of submitting it on both theories, the trial court submitted it only upon one theory, the latter of the two hereafter stated. First, it is our opinion, and the opening statement of the county attorney indicates, that, had he not been prevented by the trial judge, the evidence would have disclosed on the part of this defendant and his coparticipant Lynch a combination or conspiracy previously formed between them to steal and dispose of sugar belonging to the McKinney-Chandler Wholesale Grocery Company, when they were each employees of that company, and that resistance and escape from arrest was a part

of the common intent of each participant in the commission of such crime, and whether or not this killing was a part of such unlawful combination with such common intent was a question of fact for the jury, and the case should have been submitted to the jury on that theory under proper instructions. The trial court, however, at the outset excluded this theory, and so limited the state's proof that it was impossible to so submit the cause. It is apparent that, had the state been permitted to open avenues of proof along the line here indicated, the question of whether or not this defendant fired the fatal shot or was present actively aiding and abetting his coparticipant Lynch in the actual killing of Vanderpool would have been immaterial, because this defendant would have, under such circumstances, been responsible for the acts of his coconspirator, committed in the furtherance of the common design. The decisions in support of this theory are numerous, and it is only necessary to incorporate herein a few of the more prominent of them. Holmes v. State, 6 Okla. Cr. 541, 119 Pac. 430, 120 Pac. 300; Ruloff v. People, 45 N. Y. 213; People v. Wilson, 145 N. Y. 628, 40 N. E. 392; Territory v. McGinnis, 10 N. M. 269, 61 Pac. 208; State v. Zeibart, 40 Iowa, 169; Com. v. Brown, 90 Va. 671, 19 S. E. 447.

Eliminating the question of conspiracy, is the evidence sufficient to sustain the conviction upon the theory that this defendant, who was present, actively aided and abetted Joe J. Lynch, who, it is contended, committed the actual shooting and inflicted the wounds which resulted in the death of Vanderpool? There is no direct evidence in the record to contradict the statement of Vanderpool that Lynch was the one who shot him. Indeed, under this latter theory, upon which the case was finally submitted, it is immaterial as to which of either Hawkins or Lynch fired the fatal shot, provided, of course, the other was at the time aiding and abetting him with like intent.

We think this evidence is susceptible of no other construction than that both Hawkins and Lynch actively participated in the killing of Vanderpool. The physical facts, in our opinion, alone are sufficient to conclusively disprove any other theory, and Hawkins' conducted both at the time of his arrest, and immediately after shooting had ceased, indicate a clear desire and intent upon his part to resist and escape arrest if possible, by every means within his power, and in addition to these circumstances there is evidence in the record that both Hawkins and Lynch fired at Warner and Byrd when they approached the scene of the shooting, and it is a fair inference that if both Hawkins and Lynch were acting in concert at that time they were acting in concert immediately preceding such occurrence, because the firing at Warner and Lynch was solely for the evident purpose of escaping arrest, as must also have been the killing of Vanderpool, and neither Hawkins nor Lynch could have escaped without the active participation and consent of the other, as they were handcuffed to each other at the time.

We conclude, therefore, that the evidence is sufficient to sustain the verdict and judgment upon the theory upon which this case was submitted to the jury. The inferences properly deducible from the facts and circumstances in evidence were for the jury, and this court will decline to disturb a verdict where there is evidence in the record reasonably tending to support the same.

It is also contended that the trial court erred to the prejudice of this defendant in excluding certain proffered evidence of Dr. Ira W. Smith, concerning the alleged dying declaration of the deceased, O. B. Vanderpool. The record upon this question is as follows:

"Cross-examination. Questions by Mr. Church: Q. The bullet went in on the left side of his head? A. Yes, sir. Q. You are sure of that? A. Well I think I am. I am either right or I am wrong; it was one way or the other. I think it was the left side and came out on the right. Q. Came out under his right armpit? A. Yes, sir, if I am right on where it entered. Q. Was Mr. Vanderpool suffering when you seen him first? A. Yes. Q. Do you know whether he was conscious or not? A. Yes, sir. Q. Did you have any conversation with him? A. He spoke a few words to me. Q. Do you recall what they were? A. Yes; I believe I remember. Q. What did he say? Mr. Mason: We object to any statement there until it is shown it is competent. By the Court: Where was that statement? Mr. Church: When he was there attending him. By the Court: Where was it? Mr. Church: At the mayor's office in Commerce immediately after this shooting. By the Court: Objection sustained. Mr. Church: Defendants except. Q. Do you know whether or not Mr. Vanderpool realized at that time that he was dying? A. Yes, sir; I think he did. Q. Did he so state to you? A. He did to the crowd. Q. What did he say then? Mr. Mason: To that we object as incompetent, irrelevant, and immaterial at the time. By the Court: Objection sustained. Mr. Church: Defendant excepts. Q. Was he suffering great pain at that time? A. Well, he didn't complain of so much pain, of course the wounds— he was suffering more from more of a shock. He wasn't in as much pain as he might have been with an injury of less magnitude. By the Court: Gentlemen of the jury, you will be permitted to retire in charge of your sworn bailiff while a matter of law is being presented to the court. During your absence from the courtroom you will not discuss this case among yourselves or permit it to be discussed in your presence or hearing. Refrain from forming any conclusion as to the guilt or innocence of this defendant. Swear a bailiff, Mr. Clerk." And thereupon Mr. J. A. Triplett was duly sworn as bailiff for the jury. "By the Court: You may retire, gentlemen, with your bailiff." And thereupon the jury retired from the court in charge of their sworn bailiff; and the proceedings following, between double parentheses, occurred in their absence:

"((Mr. Church: Now at this time—By the Court: You may examine the witness. Mr. Church: I want to state to the court the purpose—By the Court: No, sir; just examine the witness. Q. Dr. Smith, at this time did Mr. Vanderpool make any statement? A. Well he—Mr. Mason: To that we object as incompetent, irrelevant, and immaterial. Mr. Seawel: And we offer it as the dying declaration of the party claimed to have been killed. By the Court: It will be rejected on that ground without any further ceremony. Mr. Seawel: Exception. Mr. Seawel: We also offer it as part of the res gestae. By the Court: You may make your offer for that purpose. Mr. Church: Defendant offers to prove by the witness, Dr. Ira Smith—By the Court: Examine your witness and see what he will swear to, and then you have your offer in the record. Q. What did this man say there at that time, Dr. Smith? A. Well, the first I remember that he said was giving his wife's telephone number in Joplin—I think her street address—and asked that she be notified of his condition. Q. What did he say with reference to who shot him? Mr. Mason: To that we object as leading, incompetent, irrelevant, and immaterial. By the Court: It may be admitted subject to the objection. It may be answered. Mr. Mason: Exception. A. Well, after he had made a statement or had had his wife telephoned of his condition, I went to give him a hypodermic. I examined him, he was only—he and Mr. Chandler were the only ones there at that time, I believe, of the injured, and I asked him some questions about the shooting or how it happened or something, and asked him if he knew who did it, he said, 'Joe Lynch,' and I thought at the time first or up until that time I thought he was one of the men that had been arrested for the crime. Mr. Warner, when he called me, said he had a bunch of sugar thieves down there shot all to pieces or something like that, and when I went in I didn't expect to find any officers hurt or anything of the kind. I expected it to be the other crowd, and I asked him who shot him, and he said, 'Joe Lynch,' and then after a few minutes— just a few minutes—they brought in Lynch and Hawkins, and I don't know whether Wood might have been there in the first place; it seems to me he was, but I am not certain about that —anyway about this time I knew Wood was sitting upon the

stove or table or something, and I got around and seen Mr. Lynch, and after I looked at him I knew who he was, and I went back to Mr. Vanderpool the second time and asked him if he was certain that Lynch was the man that shot him, and he said he was. I think there was somebody standing by heard him say that to me the second time. Mr. Church: That is all. Questions by Mr. Mason: Q. His statement as to how this injury occurred was in answer to questions propounded by you to him? A. Yes; I just asked him who shot him, and he said, 'Joe Lynch.' Q. About how long was that after the injury? A. Well, I don't know just exactly, because I was at home in bed when it happened, and they called me—it was only a few steps from my house down to the place where they had him, and it wasn't but a few minutes. I heard the shooting and was—I had gotten up, before 1 o'clock; I was out of bed, I didn't dress, just put my clothes on over my nightshirt and went on down there. Q. Did you know where the shooting occurred? A. Well, I have been told. Mr. Mason: That is all. Questions by Mr. Church: Q. He was at that time mortally wounded, was he? A. Yes, sir. Q. Do you know how long after that until he died? A. Well, I don't remember exactly, it must have been two hours before he died, if I remember. That would be about what I would judge as to the time. Q. Did you go to Miami with him? A. Yes, sir. Q. Were you with him at Miami? A. Yes, sir. Q. Until he died? A. Yes, sir. Q. How long after he made these statements until he became unconscious? A. Well pretty soon after I was talking with him the second time I left there and came on—I said I came with him—I don't— they brought him in the ambulance and I drove down in my car. I didn't ride in the ambulance with him, and I think we probably came on ahead of the ambulance to the hospital, and I don't know just how long after he became unconscious, whether before they left the mayor's office or on the road, but he was not conscious any more after he got here. I didn't see him on the road. Q. How long approximately did it take you to come from Commerce to Miami? A. Well after I left him it was a few minutes before we started. I wasn't very long driving from Commerce over here, but I was there a few minutes before I started. Q. How many minutes would you say you were in Commerce before you started

over here? A. Well I really don't remember. Q. Ten or fifteen? A. Yes; I believe so. Q. In your best judgment how many minutes did it take you to come from Commerce to Miami? A. Well I don't remember the trip. If I drove it would not take me over seven or eight minutes. Somebody else would take longer, I expect. I believe I rode over in Chandler's car and somebody else drove it. But I knew this driver. Somebody told me to get in this car of Mr. Chandler's, and he would drive me over, and I don't know whether I went and got my car or not. I don't think I did. Q. How long after you arrived in Miami until you next seen Vanderpool? A. Well it was several minutes before they brought him up to the operating room. I went on up to the operating room. I had 'phoned Dr. De Arman I believe, and told him to meet me at the hospital. From the time I last saw him in Commerce until I saw him in Miami must have been thirty or forty minutes. Q. Did he have any difficulty in speaking at the time in the mayor's office? A. No, sir; he spoke plainly and distinctly. He spoke out loud enough to hear him all over the house. Any one within twenty feet of him could understand what he said. The last words he said were a little weaker than the first. The last statement he made to me his voice was in a lower tone of voice; in fact he didn't speak out as loud in talking to me as he did when he was talking to some one that was trying to put in a call for him. He was talking to a party that was more distant from him. Mr. Church: That is all. Questions by Mr. Mason: Q. How long was he there in the mayor's office in your presence? A. Well, I don't know— it was several minutes, but I don't remember. Q. Ten or fifteen minutes? A. Longer than that. Q. Thirty minutes? A. I believe it was even more than thirty minutes. I believe it was from the time I went down there until I left, I think. It might have been more than thirty minutes, I could not be very definite on it, but I feel sure it was that much. They went back out to where the shooting occurred and brought the other men in, and I went and gave these other men some assistance, gave Mr. Lynch a hypodermic, and was around there and looked at his wounds, and it was several minutes taken in the work I did around there. I think even after I first administered my treatment to Mr. Vanderpool that I went down to

Mitchelson's house or down to the drug store or maybe down to my office or down to the undertaker's. I am not certain I went into his place, but I believe I did. Mr. Mason: That is all. Mr. Church: That is all. Mr. Mason: The state objects to the testimony of the witness for the reason it is incompetent, irrelevant, and immaterial as a dying declaration, and no part of the res gestae. By the Court: The objection will be sustained, and the offer to prove and show what the deceased, Vanderpool, said at the mayor's office subsequent to his removal from the scene of the injury will be denied as incompetent, irrelevant, and immaterial, and not a part of the res gestae, to which the defendant may have an exception. Mr. Church: Exception. Mr. Church: We offer that also as a dying declaration of the party assaulted in addition to the offer we made as part of the res gestae. Mr. Mason: To that we object as incompetent, irrelevant, and immaterial, and it does not come within the rule of dying declarations. By the Court: Objection sustained. Mr. Church: Defendant excepts.)) "

The objection that the foregoing offered testimony constituted no part of the res gestae apparently was properly sustained. It was merely narrative of a passing event, elicited by questions propounded by the doctor and afterwards answered by the deceased, and was not an incident of the event itself, nor a spontaneous utterance or declaration attending the transaction and explanatory thereof. The evidence offered does not not come within the well-known exceptions to the hearsay rule, admitting declarations as verbal acts and res gestae.

That such evidence was admissible as a dying declaration is more difficult of solution. We think it apparent that the trial court excluded this evidence as a dying declaration for the reason that the statements were not made under a sense of impending death, but we think it can be reasonably inferred from the surrounding circumstances that Vanderpool

at the time realized that he was going to die from such wounds, and that the preliminary proof was sufficient in this instance to admit such evidence as a dying declaration on the part of Vanderpool.

However, we believe this judgment should not be reversed because of the failure of the trial court to admit this evidence. In Addington v. State, 8 Okla. Cr. 703, 130 Pac. 311, this court held:

"The exclusion of evidence to prove particular facts is harmless, if the facts sought to be proved are subsequently proved by other evidence, and it is apparent that the evidence excluded could not have changed the result."

See, also, Clingan v. State, 15 Okla. Cr. 483, 178 Pac. 486.

The facts sought to be proved as a part of the dying declaration of Vanderpool were proved in this case by the testimony of the witness Charley Warner, to the effect that Vanderpool stated that Lynch was the man who shot him. The evidence had therefore been admitted as part of the res gestae. It was cumulative, and its exclusion was not, under the circumstances, prejudicial, and, in our opinion, in no way affected the result. Section 2822, Comp. Stats. 1921.

It is next contended that the trial court erred in permitting the witness Wesley Brown to testify, over objection of defendant, that the deceased, Chandler, came to his place on the night of May 31, 1920, and asked him to come out with him that night and to wait for these defendants and a car loaded with sugar.

The record shows that the trial court first sustained an objection to this testimony and did not permit the witness to testify to such facts until counsel for the defendant had asked

the witness what he was doing out there that night, and then on redirect examination permitted the witness to testify to the facts here complained of.

From what has heretofore been said concerning the first theory upon which this case could have and should have been submitted to the jury, this evidence was competent. The fact that the case was never submitted upon that theory does not alter or in any way change the competency of the evidence. The fact that the trial court narrowed the scope of the res gestae of this transaction appeared to the prejudice of the state and not to the prejudice of the defendant. What is here said also relates to other assignments of error which it is considered not necessary to discuss.

Objection is made to numerous paragraphs of the court's general charge to the jury, and to the refusal to give certain requested instructions. We have examined the instructions given in connection with those requested and are convinced that the law of the case was fairly and fully presented to the jury, and that no prejudicial error was occasioned by the refusal to give requested instructions.

Before the jury was sworn to try the case and after 12 men had been accepted, the juror Victor became sick. Under instructions from the court this prospective juror was examined by a physican and found suffering from lumbago and physically unfit to proceed with the duties of a juror. The court thereupon discharged the said Victor from further service, and thereafter ordered the clerk to issue an open venire to the sheriff to summon five additional talesmen from the body of the county. The jury was completed by the selection of one of these talesmen to take the place of Victor.

An additional peremptory challenge was allowed each to the state and defendant. The state waived such challenge but the defendant exercised his by excusing one of the original eleven.

Defendant now claims that the procedure followed was not in compliance with the statute, and the jury thus impaneled to try him was not a legal jury.

That defendant, after the discharge of Victor, was entitled to nine peremptory challenges instead of the one allowed, as the statute provides for the reimpaneling of the entire jury under such circumstances. The statute involved (Comp. St. 1921, § 2718) reads as follows:

"If, before the conclusion of a trial, a juror becomes sick, so as to be unable to perform his duty, the court may order him to be discharged. In that case or in the event of the death of a juror a new juror may be sworn, and the trial begin anew, or the jury may be discharged, and a new jury then or afterwards impaneled."

Counsel contend that, because the statute uses the words "and the trial begin anew", construed in connection with the holding of this court in the cases of Caples v. State, 3 Okla. Cr. 73, 104 Pac. 493, 26 L. R. A. (N. S.) 1033, and Simpson v. State, 4 Okla. Cr. 490, 114 Pac. 752, the trial in a criminal case begins when the jury are called into the box to be examined, that the effect of such discharge of the juror Victor was a beginning anew of the trial; that is, it reopened again the examination of the entire jury so as to entitle the defendant to the exercise of nine peremptory challenges from that time forward.

While it is true that, in the cases above cited, this court held that the trial in a criminal case commenced when the jury was called into the box to be examined as to their qualifica-

tions, it is plain we think, from the context of the statute here under consideration, that the Legislature never used the words "and the trial begin anew" with any such meaning. No good purpose could be served by reimpaneling the entire jury and reinvesting the defendant with nine additional challenges just because one juror had been discharged on account of sickness before the taking of any testimony. The statute leaves it discretionary with the trial court either to discharge the entire jury or else to swear only one new juror in the place of the one discharged. In the event the trial court sees fit to discharge the entire jury, the statute provides "and a new jury may then be or afterwards be impaneled." So it is clear that the Legislature distinguished between the impaneling of an entire new jury and the swearing only of one juror. In the latter instance the statute says "that the trial begin anew," which evidently means in this instance that if any testimony has been heard that it shall be given again for the benefit of the new juror. Otherwise the statute would have simply read "in that case the jury shall be discharged and a new jury then or afterwards impaneled."

In the case of Turner v. Territory, 15 Okla. on page 561, 82 Pac. 650, the Supreme Court of the territory approved of the procedure followed in this case, and this court assents to the views expressed by the territorial Supreme Court in the Turner Case.

It is also contended that the trial judge coerced the jury to return a verdict of guilty in this case. An examination of the record does not support the conclusion of counsel that the conduct of the trial judge amounted to acts of coercion. The jury had the case under consideration from late Saturday night until the following Wednesday morning, before a verdict was returned. In the interim the trial court called the jury

into court and inquired if there was any probability of reaching a verdict, and, on being informed in the negative, told the jury that the case was one of importance both to the state and to the defendant, and that the jurors should reason together among themselves and arrive at a verdict if possible, and then instructed the jury to return to the jury room for further consideration of the case. The language employed by the trial judge in thus admonishing the jury was not calculated to compel the jury to return a verdict. In fact, the jury remained in session for a considerable length of time subsequent to the last time the court communicated with them. The mere fact that the court kept the jury together for the length of time the jury was kept together did not of itself amount to an act of coercion, because this court has repeatedly held that the time during which a jury shall be kept together for deliberation is a matter of discretion with the trial court.

Counsel also contend that the trial judge was prejudiced against this defendant to such an extent that he could not give the defendant a fair and impartial trial. There is nothing properly incorporated in the record for review by this court on this assignment. However, by way of comment, we are constrained to state that the conduct of the trial judge throughout the trial in all the rulings made, with the possible exception of the exclusion of what was purported to be the dying declaration of Vanderpool, was more favorable to the defendant than to the state.

Other errors are assigned as grounds for reversal of this judgment, but an examination of the record discloses that they were either such as were waived in the trial or else possess no substantial merit. It would unnecessarily extend this already long opinion to give minute attention to such assignments.

It is sufficient in conclusion to say that the writer of this opinion has carefully examined this voluminous record and the able and exhaustive brief of counsel representing this defendant, and the other members of the court concur with him in the opinion that this defendant was afforded a fair and impartial trial, and that no error is urged sufficient to authorize a reversal of the judgment.

For reasons stated the judgment is affirmed.

BESSEY and DOYLE, JJ., concur.