### BUD GOSS v. STATE.

No. A-4603. Opinion Filed Sept. 22, 1923.
(218 Pac. 339.)

(Syllabus.)

1. **Appeal and Error—Discretion of Court—Refusal of Change of Venue.** Statements of affiants whose affidavits were filed in support of defendant's application for a change of venue, to the effect that they had heard a great many people talk about the case, and

that the minds of the people were so prejudiced, etc., are too vague and indefinite for this court to say, as a matter of law, that the trial court abused his discretion in refusing a change of venue.

2. **Venue—Effect of Application for Change of Venue Without Notice to County Attorney—Change of Venue Summarily Refused Where Showing by Defendant not Convincing.** An application for a change of venue made when the case is called for trial, where no notice of such application was served on the county attorney as provided in section 2628, Comp. Stat. 1921, does not operate to require the court to halt the proceedings in order to give the state an opportunity to controvert the showing made by the applicant. The court may refuse the application summarily where the showing made by the defendant is not convincing.

3. **Homicide—When Dying Declaration Inadmissible Stated.** Dying declarations are not admissible where they consist of statements of facts or circumstances not immediately connected with the act of the killing, but relate to previous distinct transactions, though they may have reference to occurrences which disclose a motive or provocation for the killing, or show a state of hostility existing between the parties.

Appeal from District Court, Carter County; B. C. Logsdon, Judge.

Bud Goss was convicted of murder, and he appeals. Affirmed.

Bass & Hardy and James H. Mathers, for plaintiff in error.

Geo. F. Short, Atty. Gen., and N. W. Gore, Asst. Atty. Gen., for the State.

BESSEY, J. Bud Goss, plaintiff in error, in this opinion referred to as the defendant, was by information filed in the district court of Carter county, June 20, 1922, charged with the murder of Nat Shivers on the 18th day of June, 1922. At the trial, by a verdict of the jury rendered September 24, 1922, the defendant was found guilty as charged, and his punishment assessed at confinement in the state penitentiary for the term of his natural life. From the judgment on the verdict he appeals.

The testimony introduced by the state was to the effect: That the wife of Nat Shivers, the deceased, a short time before this tragedy, had obtained a divorce from Shivers, based upon service by publication. She soon thereafter married the defendant, Bud Goss. That Shivers did not know of this divorce (or claimed that he did not) nor of the remarriage, and, upon his return to Carter county, finding his former wife living with Goss, on Friday before the killing on Sunday he caused the arrest of the defendant, Goss, upon a charge of living in adultery with his (Shivers') wife. That, when the defendant was arrested on this charge, Shivers accompanied the officers who made the arrest to the office of the justice of the peace. The justice refused to entertain the charge of adultery, and explained to Shivers that his former wife had obtained a divorce, and was then married to Goss, and that the charges could therefore not be maintained. Shivers then became very angry and excited, and in the presence of the justice and others made threats against the life of Goss, stating that he would "get him if he had to shoot him in the back." About 30 minutes later, after leaving the justice's office, Shivers and Goss met on the streets of Ardmore, and Goss, armed with a pistol, chased Shivers through a hardware store. A few minutes later Shivers returned to the hardware store and purchased a new Colts pistol. On Sunday, the day of the homicide, Goss informed a policeman that Shivers was going armed, and had threatened to take his life, and requested the officer to disarm Shivers.

Concerning this incident, Clarence Stokes, a police officer, testified that he saw defendant at about 12 o'clock noon, sitting in a car in front of the Adolphus theater, in Ardmore, and that, after some preliminary conversation defendant said to him: "This man Shivers has a gun on him; I want you to get it off of him." The officer then inquired where Shivers was, and

defendant told him that he was at the Randolph Hotel. The officer told defendant he would search Shivers and disarm him, left the defendant sitting there in the car, and went directly to the hotel, where he found Shivers and disarmed him. The officer then took Shivers to the police station, passing along Main street, near where defendant was still sitting in the automobile. At this time defendant was so seated and' facing in such way that he could see that Shivers was in the custody of the officer, and witnesses testified that defendant appeared to be looking in that direction. At the police station, Shivers made bond for his appearance later to answer to a charge of carrying concealed weapons. Leaving the police station, Shivers again passed along Main street, in front of the Adolphus theatre, at about 12:20 or 12:30 o'clock, where he was fatally shot by the defendant under circumstances which might be taken to indicate that the defendant knew, or had reason to believe, that Shivers had been disarmed a few minutes earlier.

One of the state's witnesses testified that just before the defendant fired he said to the deceased, "Have you got anything?" and that the deceased replied, "I haven't a thing; don't shoot." Another witness testified that he saw the shooting and heard the parties say something, but could not distinguish what it was. Other witnesses testified that they did not hear either party say anything just prior to the shooting. The testimony on the part of the state was also to the effect that, when the defendant saw Shivers on the sidewalk in front of him, Shivers made no hostile gesture or movement indicating that he was about to draw a gun.

The testimony on the part of the defendant was to the effect: That Mr. and Mrs. Shivers had separated some months previous, and that the whereabouts of Shivers was unknown to her. That she had obtained a divorce and had married Goss

soon thereafter. That after the divorce had been granted Shivers had visited a sister and other members of the family of Mrs. Goss (his former wife), from whom he had learned that his former wife had procured a divorce, and had married Goss. That he told this sister that he intended to go back to Ardmore and kill both the defendant and Mrs. Goss, and that this threat was communicated by the sister to Goss and Mrs. Goss. That soon thereafter Shivers did appear in Ardmore, and had Goss arrested for living in adultery with Mrs. Goss. When the justice of the peace refused to entertain the adultery charge against Goss, Shivers became violently enraged, and made the threat, "I am going to get you if I have to shoot you in the back." That about 30 minutes later Shivers met Goss on the street, and started toward Goss, pulling off his coat as he came. Goss drew his pistol, and Shivers ran, and Shivers then went and bought a new pistol. Shivers then went out into the oil fields, where he told certain persons that he intended to kill Goss, and that some of these threats were communicated to Goss. On Sunday morning Goss went down town to get his Sunday papers, and while he was sitting in a car in front of the First National Bank Building with some friends Shivers walked by with his hand on his pistol. That he did this twice, and that Goss then, in order to avoid trouble, drove home. That he attempted to telephone the justice of the peace to have Shivers arrested and placed under a peace bond, but that, after failing to get telephone connection, he again went down on the street. That while he was sitting in an automobile in front of a theater he saw a policeman, and informed him that Shivers was armed and had threatened to take defendant's life. The police officer found Shivers at a hotel and disarmed him. Goss however, claimed that he had no knowledge that the policeman had done so. While still sitting in this car, a few minutes later, Goss saw Shivers on the sidewalk in front of him, in the act

of turning toward him, at the same time throwing his hand behind him as if about to draw a pistol. Goss then jumped out of the car, and fired one shot into the body of Shivers, which entered from the rear near the shoulder. Shivers sank down, and bystanders carried him to the hospital, where he later died. At the time he was shot Shivers was unarmed, as before stated.

The testimony on the part of the state and that on the part of the defendant do not differ materially, except upon the question of whether the defendant knew at the time he fired the fatal shot that Shivers had been disarmed, and upon the question of whether or not the deceased made any movement or gesture indicating that he was about to draw his pistol. Upon these two issues there was ample evidence to support the theory of the state that defendant knew the deceased was unarmed, and, being unarmed, the jury could reasonably believe that deceased would. make no gesture indicating an effort to draw a gun.

Before the commencement of the trial, but on the day the trial actually began, the defendant made a motion for a change of venue on the ground that the minds of the inhabitants of Carter county were so inflamed and prejudiced against the defendant that a fair trial could not be had in the county, due chiefly to several newspaper articles indicating that the defendant was guilty of murder, and that public sentiment throughout the county had been molded against him. This application was supported by four affidavits in form as follows (all four being identical, except as to name of affiant and years of residence in Carter county) :

"I, ——, upon my oath state: That I am a resident of Carter county, Oklahoma; that I have so resided for more than— years; that I have heard a great many people of Carter county, Oklahoma, talk about the Bud Goss murder case. I further

state that the minds of the inhabitants of Carter county, Oklahoma, in which said cause is pending for trial, are so prejudiced against the defendant, Bud Goss, that a fair and impartial trial cannot be had in said county.                                ————————.''

Without hearing any counter affidavits or other evidence resisting this showing, the court ruled as follows:

''It is the opinion of the court that the showing for change of venue is insufficient. I think when a motion for change of venue is presented that it shows sufficiently to the court from testimony from various parts of the county to raise a doubt in the mind of the court as to whether a prejudice exists against the defendant; and that such prejudice exists against the defendant generally throughout the county. Jurors for the trial of cases do not come from one section of the county, and a county the size of Carter county, with numerous towns and thousands of qualified electors outside of Ardmore, the court is not satisfied from the affidavits of four residents of Carter county, all in Ardmore, as I understand, that the prejudice, if existing in Ardmore, is general throughout all the county, and the motion for change of venue is overruled and exception allowed.''

Under our practice the granting or refusing of a change of venue is within the discretion of the trial court. This discretion, of course, should not be captiously exercised; it is a discretion which may be and sometimes is abused. The right to a change of venue is defined by statute; section 2628, Comp. Stat. 1921, providing among other things that:

''Such order of removal may be made on the application of the defendant by petition, setting forth the facts, verified by affidavit, if reasonable notice * * * be given to the county attorney and the truth of the allegations in such petition be supported by the affidavits of at least three credible persons, who reside in said county.''

The record shows that in this case no notice of an intention to apply for a change of venue was served on the coun-

ty attorney. The county attorney had no opportunity to prepare to meet the supporting affidavits by counter affidavits, or other evidence. The case, we assume, was set for trial on the day the application for a change of venue was made. It would be unfair to the state, and contrary to the provisions of the statute, to thus halt the proceedings in order to try this issue without notice. Furthermore, the application and the supporting affidavits, for the most part, stated mere conclusions of affiants. The newspaper articles complained of were not offered in evidence, and the statements of affiants in support of the petition may be considered as their own personal opinions, which may or may not have been sufficiently founded in fact. The mere fact that the affiants had heard a great many people talk about this case and the statement that the minds of the people were so prejudiced are too vague, too indefinite, for this court to say, as a matter of law, that the trial court abused his discretion in refusing a change of venue.

In the case of Starr v. State, 5 Okla. Cr. 440, 115 Pac. 536, the court said:

"On an application for a change of venue the affidavit of the defendant in support thereof must not only aver 'that the minds of the inhabitants of the county in which the cause is pending are so prejudiced against the defendant that a fair and impartial trial cannot be had therein', but it must also set forth the facts rendering a fair and impartial trial there improbable."

The presumption of law is that a defendant can get a fair and impartial trial in the county in which the offense was committed, and, if this is not true, the burden is upon the defendant who seeks a change of venue to establish his right thereto. Maddox v. State, 12 Okla. Cr. 462, 158 Pac. 883.

Defendant complains that he was denied the alleged right to interrogate each and all of the jurors as to whether they were or had recently been or ever expected to be members of the Ku Klux Klan. The examination of a juror on his voir dire has a twofold purpose, namely, to ascertain whether a cause for challenge exists; and to ascertain whether it is wise or expedient to exercise the right of peremptory challenge given to parties by law. Such an examination is proper so long as it is conducted strictly within the right to discover the state of mind of the juror as regards the matter in hand or any collateral matter reasonably liable to influence him. The trial court, in the exercise of a sound discretion, may limit the extent of an examination upon any of the particulars of the qualifications of jurors. 16 R. C. L. 246, 247. In this case the testimony nowhere discloses that this organization, or any organization, was taking any interest in this prosecution, or that the things advocated or condemned by it would in any way directly or indirectly affect the trial. The rule might be otherwise if a showing had been made that this organization, or members of it, were actively interested in the prosecution or the defense.

The motion of defendant to quash the special panel drawn from the jury list, ordered by the court, also a motion to quash a subsequent list of jurors ordered summoned from the body of the county, and to strike the names of certain jurors from the panel because they had served as jurors within a year of this trial, have all been considered, and we find no error in this regard apparent in the record.

A dying declaration was admitted in evidence, as follows:

"I realize I am near death, and have no hope of recovery, and I wish to make a statement. I was walking up this straight street in Ardmore, the main thoroughfare. I saw this man, Bud Goss, that I had had a lot of trouble with. I says, 'Bud, I have

not got a gun.' He threw his gun on me. I started to run, and
he shot me in the shoulder and back. He told me three or four
days ago that he was going to kill me. I had him prosecuted
for breaking up my home and happiness.        Nat Shivers.''

The defendant urges that there was error in the refusal of
the court to sustain his motion to exclude the concluding sen-
tence of this dying declaration: ''I had him prosecuted for
breaking up my home and happiness.''

Dying declarations are not admissible were they consist of
statements of facts or circumstances not immediately connected
with the act of the killing, but relate to previous distinct trans-
actions, even though they have reference to occurrences which
disclose a motive or provocation for the killing, or show a state
of hostility existing between the parties. 1 R. C. L. 533, 535;
Ann. Cas. 1912C, 429, note; State v. Kelleher, 224 Mo. 145, 123
S. W. 551; 19 Ann. Cas. 1270; 21 Ann. Cas. 152, note. This
court, in a well-considered opinion  written by Judge Arm-
strong (Wratislaw v. State, 18 Okla. Cr. 150, 194 Pac. 273),
adopted the rule above stated, and reviewed the authorities on
this point at length. Applying this rule to the sentence to
which objection was made in this case, the motion of defend-
ant to exclude that part of the dying statement should have
been sustained. We think, however, under the circumstances
in the instant case, that the error in refusing to exclude this
sentence did not operate to the prejudice of the defendant. The
testimony on both sides was to the effect that the deceased and
his wife had separated some months earlier, and that the de-
fendant Goss had nothing to do with the separation; that the
wife of the deceased obtained a divorce, and, so far as the rec-
ord shows, Goss had nothing to do with procuring the divorce;
that, after the separation of the deceased and his wife, the de-
ceased left the state of Oklahoma, and went to Louisiana and
Arkansas, where he traveled about from place to place; that

the defendant, who had also obtained a divorce from his wife, married the wife of the deceased; that deceased, upon returning to Ardmore, caused the arrest of the defendant on the charge of living in adultery with his former wife, and that the justice of the peace and the county attorney refused to entertain the prosecution because the parties were legally married, after having obtained their divorces. We conclude, therefore, that, notwithstanding the improper admission of this part of the dying declaration, the jury were not misled, but were in possession of all the facts indicating that the defendant in reality had nothing to do with the domestic troubles of the deceased. Under such circumstances the error was manifestly not prejudicial. Section 2822, Comp. Stat. 1921.

Several of the assignments of error are to the effect that the court excluded competent evidence on the part of the defendant, and permitted the state to introduce incompetent evidence. Some of the claims so made are not supported by the record. In other cases the evidence was properly refused. In one or two other instances the court improperly excluded testimony which was subsequently admitted.

"The exclusion of evidence to prove particular facts is harmless, if the facts sought to be proved are subsequently proved by other evidence, and it is apparent that the evidence excluded could not have changed the result." Addington v. State, 8 Okla. Cr. 703, 130 Pac. 311; Hawkins v. State, 24 Okla. Cr. 82, 216 Pac. 166.

A careful examination of the evidence in this case convinces us that all the evidence offered which was pertinent to the issues went to the jury, in some form or other, and that no competent evidence was finally withheld from the jury, so that the jury, when the cause was finally submitted, was in possession of every fact which bore upon the issues involved. If the policeman had not disarmed the deceased a few minutes before

the tragedy it may be that the defendant would have suffered death, and that the deceased would have been the survivor. Even so, the case must be considered upon the facts and circumstances as they occurred, not upon what might have occurred if the deceased had been armed. From a consideration of the facts herein recited, and from other evidence appearing of record, we suspect that each of the parties to the affray had been going armed for the purpose of taking the life of the other if that could be done under color or claim of self-defense. Whether the homicide was actually committed in self-defense, as distinguished from a mere pretext of self-defense, was a question for the jury. This issue was submitted to them under apt instructions, and the finding of the jury that the defendant's plea of self-defense was not sustained should not be disturbed by this court.

The judgment of the trial court is affirmed.

MATSON, P. J., and DOYLE, J., concur.