### ALEX RAWLS v. STATE.

No. A-10790.   Feb. 18, 1948.
(190 P. 2d 159.)

120

J. W. Dixon, of Marietta, and Champion & Fischl, of Ardmore, for plaintiff in error.

Mac Q. Williamson, Atty. Gen., and Sam H. Lattimore, Asst. Atty. Gen., for defendant in error.

JONES, J. The defendant, Alex Rawls, was charged by information filed in the district court of Love county with the crime of attempted rape, was tried, convicted and sentenced to serve the minimum term of seven and one-half years imprisonment in the State Penitentiary, and has appealed.

There are a large number of assignments of error in the brief of defendant. As will be hereinafter shown, it is apparent that this case will have to be reversed and remanded. For that reason, we have only undertaken to discuss those questions raised in the brief of the defendant which might again arise upon another trial.

The defendant was charged with attempted rape upon one Wilma Marie Hartman, a six year old girl, who lived near Burneyville, on February 7, 1946. The case was tried on March 26, 1946, and resulted in a hung jury. On April 16, 1946, the case was assigned for a second trial, commencing on April 29, 1946. On April 23, 1946, the defendant filed a motion to disqualify the sheriff. On that date he served a copy of the motion on the county attorney and notified him at that time that he was preparing a motion for a change of venue and was procuring supporting affidavits. That he would present the motion for change of venue at the same time he presented the motion to disqualify the sheriff. At that time, it was agreed that the motions would be presented on Thursday, April 25th. However, upon investigation they learned that the district judge was out of the county presiding at the trial of some litigation in an adjoining county and would not return to Love county until Friday, April 26, 1946. It was thereupon agreed to present the motions to the judge on that date. The motion for change of venue together with 100 supporting affidavits was filed on Friday, April 26, 1946. However, the district judge had been delayed

in his return to Love county and the motions which had been filed were not presented to him until Saturday morning, April 27, 1946.

The record discloses that counsel for the defendant made a long statement as to why he thought the venue should be changed to another county, and that at the conclusion of his statement the court denied the motion to change the venue and stated:

"I know most of these people who signed these affidavits. I have sixty men coming in here, the only way to tell about that is to examine the jurors, this Mr. Boley, that is one on here, he is a juror and he has asked me to be excused. I don't remember if I excused him or not. He did not give as a reason that he was disqualified as a juror, but merely stated something about having to drive the school bus."

In the written order signed by the district judge, it is stated:

"Thereupon, the Court hears the motion of the defendant for change of venue. The defendant introduced his affidavits in support of his motion for change of venue, including the affidavits of N. A. Sanders and Oscar Parker and approximately one hundred other citizens of Love County. The State offers no affidavit or evidence to contradict the allegations of said motion for change of venue or the affidavits in support thereof. The Court, having heard said matter, finds that said motion for change of venue should be and is hereby overruled; to which action of the Court the defendant excepts."

The motion for change of venue filed by the defendant together with the affidavits of N. A. Sanders and Oscar Parker read as follows:

"Comes now the defendant, Alex Rawls, and moves the Court to grant him a change of venue in this case and to send this case to some other county in the State of Okla-

homa for trial because this defendant cannot have a fair and impartial trial in Love County, for the following reasons:

"This defendant was arrested on or about the 16th day of February, 1946 charged with assault with intent to rape one Wilma Marie Hartman, a six year old girl, the daughter of Mr. and Mrs. Charles Hartman, who live near Burneyville in Love County. Said offense is alleged to have taken place in front of the home of said child on the afternoon of February 7, 1946. The fact that said charge was filed against this defendant was published in the Marietta Monitor, a newspaper of general circulation in said county. Within less than thirty days this case was set for trial in the District Court and the fact that it was set for trial was published in said paper. The case was tried on March 26, 1946 and resulted in a hung jury and a mis-trial was declared on March 27, 1946. The trial attracted a large crowd which filled the courtroom and people from all over Love County were in attendance.' The fact of the hung jury was published in said paper. Since said trial said case has been discussed all over Love County, which is a small county, and this discussion has aroused and created a sentiment against this defendant throughout the county, which prevents him from having a fair and impartial trial to which he is entitled to under the Constitution of this State. The feeling against this defendant in said county runs so high that people have been heard to say that they thought he ought to be mobbed and hung.

"Defendant says that he is not guilty of the charge against him and is entitled to be tried before a fair and impartial jury and in a county where he can get a fair and impartial trial.

"In support of this motion for change of venue, defendant attaches and submits herewith the affidavits of N. A. Sanders and Oscar Parker, who, at the request of this defendant, contacted several hundred citizens of this County to determine the sentiment in the County against this defendant, and attaches hereto 100 affidavits signed

by reputable citizens, residents and voters of this County who have stated that they have a fixed opinion with reference to this case and that this defendant cannot have a fair and impartial trial. In addition to these affidavits the defendant further states that the said N. A. Sanders and Oscar Parker in contacting several hundred citizens of Love County found that such a high state of feeling had been worked up against the defendant that upon approaching various and sundry citizens they met resentment upon even asking them to sign the affidavit and that most of the citizens approached made the bare statement in an indignant manner that they would not have anything to do with the case at all.

"Defendant says that he is a married man with wife and three children; that he is 40 years of age and lives at Marietta, Oklahoma. That the character of the crime with which he is charged is repulsive and such as to engender the high state of public feeling against one charged with such crime and the same has been talked about and discussed all over Love County, especially since said first trial, and the fact that the case is again set for trial only thirty-two days after the first trial is evidence in the minds of lots of people that the officials of Love County believe him to be guilty and that he should be convicted. This is especially true because it has been the custom in Love County for many years to hold not more than one or two terms of jury a year and where more than one term is held a year they have been several months apart. So the fact that two jury terms of Court are being held within thirty days of each other has aroused and created sentiment against this defendant. It is a known fact in Love County that this defendant's case was the only criminal case on the March docket for trial and that there are only three cases, including this case, set for trial on the April docket.

"For all of which reasons defendant asks that he be granted a change of venue herein.

"Alex Rawls

"Subscribed and sworn to before me this 26th day of April, 1946.

"(SEAL)    Robert Miller, Notary Public.

"My commission expires: June 7, 1949."

"Endorsed as follows: Filed in District Court—Love County, Oklahoma—Apr. 26, 1946

"John C. Wicker, Court Clerk.

"Attached to said motion for change of venue appears the Affidavit of N. A. Sanders and Oscar Parker, together with one hundred other affidavits, in words and figures following:

"State of Oklahoma, Love County.    ss.

"N. A. Sanders and Oscar Parker, being duly sworn on oath, say that they are both residents of Love County, Oklahoma and have lived in said county for more than 25 years each.  That they know Alex Rawls and in his behalf, between April 20, 1946 and April 25, 1946, contacted several hundred persons in Love County to ascertain from them whether or not any such persons, all of whom were residents of Love County, had fixed opinions with reference to the case of State of Oklahoma against Alex Rawls, in the District Court of Love County, Oklahoma, in which said Alex Rawls is charged with attempting to assault the little Hartman girl near Burneyville. That these affiants talked to several hundred residents of said county and that only two or three of the people they talked to said that they thought Rawls could get a fair and impartial trial in Love County.  That approximately ninety of the people they talked to signed affidavits stating that they had fixed opinions in the case and that they did not believe Rawls could get a fair and impartial trial in Love County; that the affidavits were read to each of the signers before they were signed by them.  Practically every person they had talked to had heard of the case, knew about it and had heard it discussed.  Among those whom these affiants talked to who did not sign affidavits were the following residents of

Love County, who made the remarks opposite the name of each:

"Jack Nichols, Greenville: Heard lot about it, in such mess didn't want to have anything to do with it.

"E. R. Gentry, Highway 77, near Hickory Bridge: Didn't want to get mixed up in case.

"Frank Shellenberger, Marietta: Knew defendant and prosecuting witness—messed up deal—didn't want to have anything to do with it.

"Jim Bosley: Looks to me like he is in bad fix.

"Charley Hogue, Overbrook: Didn't want have anything to do with it—messed up affair—knew both parties.

"A. L. Page: Don't want to express myself or have anything to do with it.

"Wm. Jones, Marietta, Route 1: Afraid to have anything to do with it.

"Dabney Colston: Don't want to have anything to do with it.

"Ernest Davenport and Lee McBride, Rubottom: Had fixed opinion, but wouldn't sign.

"Ed Monroe: Didn't want anything to do with case.

"Jodie Porter: Would not have anything to do with case.

"Wm. Adair: Didn't want to have anything to do with it.

"Ell Hudson, Thackerville: Had reason for not signing.

"Jesse Porter, Orr: Don't want to have anything to do with it.

"Charles Gibson and John Harris, Leon: Don't think he can get a fair trial.

"George Newell, Simon: Didn't want to have anything to do with case.

"W. J. Gilbert, Leon: Don't think he can get fair trial. One of his friends advised him not to sign affidavit—said it would ruin him. Afterwards sent word would sign affidavit.

"Fred Jessup, Eastman Route: He ought to be punished severely.

"John Aken, Burneyville: Fixed opinion—didn't want to sign.

"Fred Furrh, Rubottom: Thought ought to be sent penitentiary—would help go with mob to mob him.

"Raymond Furrh, Rubottom: Thought guilty.

"Jim McDaniel, Rubottom: Thought guilty and ought to be in penitentiary.

"J. J. Carnahan, Courtney: Said looked like guilty.

"Mr. Hutto, Marietta: Can't sign—he's guilty as hell —might as well go on.

"J. M. Teafenteller, Courtney: Thought he was guilty.

"Howard Lone, Rubottom: Fixed opinion.

"Bob Barrett, Rubottom: Knew too much about it to be signing anything.

"Clarence Cathey, Bellsville: Sentiment pretty strong against Rawls.

"That only one or two of said parties said they believed Rawls could have a fair and impartial trial in said County.

"R. A. Sanders
"O. M. Parker

"Subscribed and sworn to before me, the undersigned notary public, on this 26th day of April, 1946.
"(Seal)    Robert Miller, Notary Public.

"My commission expires: June 7, 1949.

"Endorsed as follows: Filed in District Court—Love County, Oklahoma—Apr. 26, 1946

"John C. Wicker, Court Clerk."

The supporting affidavits of 98 men attached to the motion read substantially the same. In addition to giving the names, addresses, and length of residence of each affiant in Love county, the affidavits substantially state that they have heard much discussion about the case against the defendant, Rawls, and each of the affidavits concluded with this statement:

"Affiant has a fixed opinion as to the guilt of Rawls in this case and from what he knows and has heard others say he does not believe Rawls can get a fair and impartial trial in Love County."

By statute it is provided:

"Any criminal cause pending in the district court may, at any time before the trial is begun, on the application of the defendant be removed from the county in which it is pending to some other county in said judicial district, whenever it shall appear in the manner hereinafter provided, that the minds of the inhabitants of the county in which the cause is pending are so prejudiced against the defendant that a fair and impartial trial cannot be had therein. Such order of removal may be made on the application of the defendant by petition, setting forth the facts, verified by affidavit, if reasonable notice of the application be given to the county attorney and the truth of the allegations in such petition be supported by the affidavits of at least three credible persons, who reside in said county. The county attorney may introduce counter affidavits to show that the persons making affidavits in support of the application are not credible persons and that the change is not necessary, and may examine the witnesses in support of said application in open court in regard to the truth of said application; and if it be made to appear by the affidavits and examination of witnesses that a fair and impartial trial cannot be had in the coun-

ty, a change shall be granted and the order made by the court. * * *" Tit. 22 O. S. 1941 § 561.

This statute has been before this court for consideration numerous times. It is now well settled that the granting or refusing of a change of venue is a matter resting with the sound discretion of the trial court to be disposed of in furtherance of substantial justice; and that the action of the trial court will not be disturbed unless there is an abuse of discretion. Johnson v. State, 55 Okla. Cr. 55, 24 P. 2d 1018; Jewell v. State, 41 Okla. Cr. 389, 273 P. 866; Newton v. State, 56 Okla. Cr. 391, 40 P. 2d 688; Hollingsworth v. State, 50 Okla. Cr. 164, 297 P. 301; Sweet v. State, 70 Okla. Cr. 443, 107 P. 2d 817: Abby v. State, 72 Okla. Cr. 208, 114 P. 2d 499, 115 P. 2d 266.

It is also well settled that an application for change of venue comes too late where presented without reasonable notice to the county attorney so as to enable him to make preparation to resist the application by procuring counter affidavits or otherwise if he so desires. Caples v. State, 3 Okla. Cr. 72, 104 P. 493, 26 L. R. A., N. S., 1018; Goss v. State, 24 Okla. Cr. 383, 218 P. 339.

In this connection it is well to note that even though the motion was not presented to the trial court for action until Saturday April 27, 1946, just two days before the case was set for hearing on Monday, April 29, 1946, that the county attorney raised no question of lack of notice and made no objection to having the motion presented at that time, it having been shown by counsel for defendant that he was given notice on Tuesday, April 23, 1946, of the defendant's intention to present a motion for a change of venue at the earliest opportunity that it could be heard.

In the case of Quinn v. State, 54 Okla. Cr. 179, 16 P. 2d 591, this court, in defining what is meant by the term

abuse of discretion of the trial court in passing on a motion for a change of venue, stated:

"By 'abuse of discretion' is meant a clearly erroneous conclusion and judgment; one that is clearly against the logic and effect of such facts as are presented in support of the application, or against the reasonable and probable deductions to be drawn from facts disclosed on the hearing."

In the body of the opinion in that case this court stated that the defendant had made a prima facie showing entitling him on its face to a change of venue. The state contested the motion for change of venue and filed 143 counter affidavits.

In the body of the opinion this court stated:

"The counter showing made by the state not being sufficient to overcome the prima facie case made by the defendant, it was an abuse of discretion for the trial court to refuse to grant a change."

In all of the cases that we have examined on the point at issue, we have found that the prosecution made a showing by examination of the individuals who signed the supporting affidavits of the defendant, or by filing counter affidavits or in some manner presented evidence to overcome the prima facie case made on behalf of defendant.

In the instant case, the county attorney, during the discussion at the time the motion for change of venue was presented, did not say one thing. He did not present any counter affidavits in opposition to the defendant's motion, nor make any other statement in opposition to the motion for change of venue. Under this state of record, this court is left with only one question to determine, and that is whether the motion for a change of venue on its face presented a prima facie case entitling the defendant to a change of venue. We conclude that it does.

We have carefully examined the addresses of the various affiants, and have found that these men lived at different places throughout Love county. Included in the list of supporting affidavits on behalf of the defendant are affiants who lived in the towns of Marietta, the county seat, Leon, Oswalt, Courtney, Thackerville, Jimtown, Simon, Burneyville, Overbrook, Eastman, and Pike, and there were also men living on rural routes out of some of the towns, including men who lived on six different rural routes out of the county seat of Marietta. Counsel for the defendant stated to the court the affiants were good citizens and fairly represented every section of the county. There is no statement of the court or evidence in the record to refute this assertion.

In addition, the record discloses that before the jury of twelve men were selected, 22 jurors were excused by the court because they had a fixed opinion as to the guilt or innocence of the defendant and that the defendant exhausted all of his peremptory challenges. The record also shows that of the twelve men selected as jurors, all of them stated on voir dire examination that they had heard the case discussed. Two of the jurors remaining on the jury stated at the beginning of the voir dire examination that they had an opinion as to the guilt or innocence of the defendant, but further in their voir dire examination stated that they did not have such fixed opinion but that they could disregard it and render a verdict based upon the law and evidence.

As an illustration of the tenseness that pervaded the courtroom, the juror Greenwood testified:

"Q. Have you heard anything about the facts in this case? A. Yes, sir, twelve or fifteen maybe. Q. Have you formed or expressed an opinion in this case? A. No, sir. Q. Have you ever told anyone what you thought ought to

be done in the case? A. I told a few what I would do if it was a girl of mine."

This juror was excused by the court, but his statement that he had told what he would do if it was his girl made in the presence of the other prospective jurors was damaging to the defendant.

Of the twelve jurors finally selected to determine the case, besides the two above mentioned who had formed an opinion which they said they could disregard, if chosen as jurors, the state of mind of the others is best illustrated by the response of the juror Gilcrease to the question: "Q. Have you formed an opinion in this case? A. No, sir, I have only heard what is going on over the country." We have chosen this statement as typical of the response made by each of the jurors as they each testified that they had heard considerable about the case, but they were allowed to sit as jurors because they did not disqualify by stating that they had a fixed opinion as to the guilt or innocence of the accused.

It was said in Abby v. State, supra [72 Okla. Cr. 208, 114 P. 2d 500]:

"In this day of paved highways, the wide use of rural telephones, daily papers, and radios, the mere fact that the inhabitants of a county have read and heard of the commission of a crime does not disqualify them. To warrant a change of venue, it must be made to appear they have a fixed opinion as to the guilt or innocence of an accused to the extent that he cannot have a fair trial by an impartial jury."

In determining whether the trial court abused his discretion, we have found the following authorities defining the phrase "discretion of court":

In Belt v. Morris, 168 Okla. 528, 34 P. 2d 581, the Supreme Court of Oklahoma defined the phrase, "discretion of court," as follows:

"Phrase 'discretion of court,' as applied to granting and denying new trials, means legal discretion to be exercised in discerning course prescribed by law according to principles ascertained by adjudged cases, and always for purpose of giving effect to will of law."

In the case of Abbott v. L'Hommedieu, 10 W. Va. 677, "discretion" is defined as follows:

"To say that granting an application rests 'in discretion' does not mean that it may be granted or refused at the mere will or pleasure of the judge, but that he is to exercise a sound judicial judgment. In the interest of justice and prudence."

The following quotation from Ex parte Chase, 43 Ala. 303, 310, is enlightening:

" 'The discretion of a judge is the law of tyrants: it is always unknown; it is different in different men; it is casual, and depends upon constitution and passion. In the best it is often at times capricious; in the worst it is every vice, folly, and madness to which human nature is liable.' I Bouv. Law Dict. vide 'Discretion,' page 473. This may be to some extent an extreme statement of the objection, but every practitioner of experience well knows that it is not without much truth. The writer of this opinion has known a popular judicial officer grow quite angry with a suitor in his court, and threaten him with imprisonment, for no ostensible reason save the fact that he wore an overcoat made of wolf skins. Moreover, it cannot be safely denied that mere judicial discretion is sometimes very much interfered with by prejudice, which may be swayed and controlled by the merest trifles, such as the toothache, the rheumatism, the gout, or a fit of indigestion, or even through the very means by which indigestion is frequently sought to be avoided. In further illustration of what judicial discretion ought to be, but not

infrequently is not, I add an extract from an opinion, in a case of national importance, by·one of our country's greatest men, and ablest and purest judges, Chief Justice Marshall says: 'Courts are mere instruments of the law, and can will nothing. When they are said to exercise a discretion, it is a mere legal discretion; a discretion to be exercised in discerning the course prescribed by law, and when that is discerned it is the duty of the court to follow it. Judicial power is never exercised for the purpose of giving effect to the will of the judge; always for the purpose of giving effect to the will of the Legislature, or, in other words, to the will of the law.' Osborn v. United States Bank, [22 U. S. 738, 866], 9 Wheat. 738, 866, 6 L. Ed. 204. Whatever may have been the construction of this important statute heretofore, it is now evidently unwise longer to keep so indispensable a right as that of a fair and impartial trial, in a criminal case, under the uncertain security of a power so uncontrollable and liable to error as mere judicial discretion—a power that may possibly be misdirected by a fit of temporary sickness, an extra mint julep, or the smell or looks of a peculiar overcoat, or things more trivial than these, which may imperil the due course of justice in the administration of the law.

"The word 'discretion,' when applied to a court of justice, means sound 'discretion' guided by law. It must be governed by rule, not by humor; it must not be arbitrary, vague or fanciful, but legal and regular. Jarrett v. High Point Trunk & Bag Co., 142 N. C. 466, 55 S. E. 338."

In the case of Sweet v. State, supra [70 Okla. Cr. 443, 107 P. 2d 820], it is stated:

"The presumption of law is that a defendant can get a fair and impartial trial in the county in which the offense was committed; and if this is not true, the burden is upon the defendant who seeks a change of venue to establish his right thereto. Davis v. State, 53 Okla. Cr. 411, 12 P. 2d 555; Goss v. State, 24 Okla. Cr. 383, 218 P. 339; Maddox v. State, 12 Okla. Cr. 462, 158 P. 883.

"On a motion for a change of venue, if upon the examination of the affidavits and counter-affidavits, and the examination of the witnesses in support of the application in open court, the court is convinced that a fair and impartial trial cannot be had in the county, then and under those conditions it is mandatory that he grant a change of venue, but not otherwise. He sits in judgment on that question just as any other question of fact that might be submitted to him, and unless it is clear that he has abused his discretion, or committed error in his judgment his finding and judgment will not be disturbed by this court. Warren v. State, 24 Okla. Cr. 6, 215 P. 635; Wright v. State, 12 Okla. Cr. 443, 158 P. 290; Gentry v. State, 11 Okla. Cr. 355, 146 P. 719; Sayers v. State, 10 Okla. Cr. 233, 135 P. 1073; Edwards v. State, 9 Okla. Cr. 306, 131 P. 956, 44 L. R. A., N. S., 701; Watson v. State, 9 Okla. Cr. 1, 130 P. 816.

"By an abuse of discretion is meant a clearly erroneous conclusion and judgment; one that is clearly against the logic and effect of the facts presented in support of and against the application. Johnson v. State, 1 Okla. Cr. 321, 97 P. 1059, 18 Ann. Cas. 300; Black v. State, 3 Okla. Cr. 547, 107 P. 524; Turner v. State, 4 Okla. Cr. 164, 111 P. 988; Starr v. State, 5 Okla. Cr. 440, 115 P. 356; Tegeler v. State, 9 Okla. Cr. 138, 130 P. 1164."

It is our conclusion, based upon the above authorities, that the defendant made a prima facie showing in his motion for change of venue, which in the absence of any counter affidavits or counter showing of some nature was sufficient on its face to entitle him to a change of venue, and that the action of the court in overruling the motion without requiring some showing from the county attorney was arbitrary, oppressive and constituted an abuse of discretion.

It is further contended that the court erred in permitting the county attorney to surrender the duties of his office to John Steele Batson, and permitting the said

John Steele Batson to prosecute the defendant in so called public service.

The record does not sustain the defendant in this contention. The county attorney expressed to the court the reasons for the appearance of Mr. Batson on behalf of the prosecution. The record discloses that the county attorney retained control of the prosecution and examined the witnesses on behalf of the state. The county attorney did not surrender the prosecution to outside interest as contended by the defendant. We have found nothing improper at all about the appearance of Mr. Batson as a Special Prosecutor. For a statement of the duties of a county attorney, reference is made to the case of Perry v. State, 84 Okla. Cr. 211, 181 P. 2d 280.

It is unnecessary to discuss the assignments relating to the alleged misconduct of the county attorney stating his personal opinion as to the guilt of the accused while a witness or of the alleged improper argument of the Special Prosecutor.

This court has spoken many times about what constitutes prejudicial arguments and in the retrial of this case, we feel quite sure that the alleged prejudicial statements will not be repeated. We refer particularly to the statement by the Special Prosecutor that the defendant had made his money in the "black market" when there was no evidence at all to support such a rash assertion.

We have examined the instructions which were given and also those refused. The instructions which were given were substantially correct and included the essence of the requested instructions. In this connection, we refer to the cases of Kitchen v. State, 66 Okla. Cr. 423, 92 P. 2d 860; and Easter v. State, 74 Okla. Cr. 114, 123 P. 2d 691, in which cases this court reviewed the law applicable to

charges of attempted rape and assault with intent to commit rape. If these two cases are followed, the trial court will have no difficulty in giving proper instructions on these two offenses.

Counsel for the defendant does not dwell upon any alleged errors in the instructions which were given and in the brief of the state the instructions are not mentioned. However, since this question was one of the assignments of error presented in the petition in error and brief of defendant, we have examined the instructions to see whether they substantially stated the law and we find that they do so.

For the reasons hereinabove stated, the case is reversed and remanded, with directions to grant a change of venue, and that the court to which the case is transferred proceed with an immediate trial of the case in accordance with this opinion.

BAREFOOT, P. J., and BRETT, J., concur.