## WININEGAR v. STATE.

No. A-11759. May 13, 1953.

Rehearing Denied June 3, 1953.

(257 P. 2d 526.)

W. L. Steger, Durant, James H. Mathers and James C. Mathers, Coalgate, for plaintiff in error.

Mac Q. Williamson, Atty. Gen., Sam H. Lattimore, Asst. Atty. Gen., and R. H. Mills, County Atty., Bryan County, Durant, for defendant in error.

POWELL, P. J. Jasper Lee Wininegar, alias Jack Jackson, hereinafter referred to as defendant, was charged by information in the district court of Bryan

county with the crime of murder, and conjointly with Grady Sargent and Hiram Robinson. On February 21, 1952, the court granted a severance, and the state elected to first try Jasper Lee Wininegar. He was tried before a jury, found guilty and his punishment assessed by the jury at imprisonment at hard labor in the State Penitentiary for the remaining period of his natural life. Appeal has been duly perfected to this court.

For reversal some 20 assignments of error are set out in the petition in error, but in brief no separate specifications of error are stated as required by the rules of this court, and the errors alleged are argued without division. The Attorney General's brief consists of but a fraction over two pages, without a citation of authority.

The principal complaint has to do with, (1) the refusal of the trial judge to disqualify; (2) his refusal to continue the case until the defendant could apply to this court for a writ of mandamus to compel disqualification; (3) the denial of application for a change of venue; (4) the action of the court in overruling the demurrer of the defendant to the evidence introduced by the State; and (5) prejudicial, inflammatory and unfair remarks alleged to have been made by the attorneys for the State, which prevented defendant from having a fair trial.

The information was filed in the district court on January 17, 1952. It charged the crime of murder to have been committed in Bryan county on December 13, 1951, particularized as follows:

"That is to say, the defendant did in said county and state, at the date above named, unlawfully, wrongfully, knowingly, wilfully, maliciously, intentionally and feloniously, without authority of law and with a premeditated design upon the part of the said Jasper Lee Wininegar, alias Jack Jackson, Grady Sargent and Hiram Robinson, acting conjointly and together, did effect the death of one Morgan Haddock by shooting and discharging certain metal and leaden shot into the body of the said Morgan Haddock from a shot gun then and there held in the hands of the said defendants. and did then and there and thereby inflict upon the body of the said Morgan Haddock certain mortal wounds, from which wounds the said Morgan Haddock did then and there languish and die, contrary to the form of the statutes in such cases made and provided, and against the peace and dignity of the State of Oklahoma."

Considering first the refusal of the trial judge to disqualify, the record discloses that the defendant was arrested within two to four hours after the shooting with which he was charged. The date of the docket setting the case for trial after said filing is not shown by the record, but it is shown that the case was set for trial for February 24, 1952, and that the defendant was arraigned on February 21, 1952. On February 23, 1952, he filed an application before the trial judge seeking a change of judge, and also an application seeking a change of venue. On February 25, 1952, the date of trial as originally set, an amended application for change of judge was filed and the court thereupon reset the case for trial for February 27, 1952. On February 25, 1952, there was also filed in the Criminal Court of Appeals by the defendant an application for writ of mandamus, seeking an order directing the trial court to disqualify. This application was never heard by this court in that the county attorney did not agree on a hearing instanter and there was insufficient time for response and a hearing prior to February 27. The county attorney and the district judge were engaged in the trial of other cases. After the trial, the petition was by this court dismissed as moot.

In the application for change of judge reflected in the case-made, in explanation of the absence of supporting affidavits attached to the application, it is set out that witnesses could be called into court. If there was any evidence introduced in support of the allegations of prejudice on the part of the trial judge,

the same is not reflected in the record presented to this court. The allegations are mostly in the nature of conclusion; no incidents are particularized or detailed to show prejudice of the court. And as stated, no proof at all is before us. Applicant cites no case in support of the proposition, and apparently does not attach much importance to it. This court, however, has carefully considered the entire record as presented by the case-made to discover any evidence of prejudice, not only in the proceedings prior to trial, but in the cumulative remarks and rulings of the court during the progress of the trial.

The record reflects that the court a majority of times sustained the objections interposed by counsel for the defendant to evidence attempted to be introduced, form of questions by the prosecution, etc., and it is very noticeable in reading the record of the trial proper that the court made every effort to prevent error and to see that the accused was accorded a fair and impartial trial.

The chief complaint against the trial judge is that it is alleged that he fixed the bond of one codefendant at $10,000, and one at $2,500, but did not allow bond for this defendant. This would not indicate error necessarily, as presumably the court was governed in the fixing of bond of the respective defendants by the nature and quality of evidence bearing on the guilt of a particular defendant as developed at the preliminary hearing.

Complaint is made that the trial judge ordered the defendant to the State Penitentiary for safekeeping prior to trial, and that it required an order from this court to make possible the return of the prisoner to the jail at Durant where he could be consulted and conferred with by his attorneys and family prior to trial. This court made the order for the reason that the case was scheduled for early trial and to enable defense counsel better to prepare their client's defense. No bad faith was found on the part of the trial judge.

It is also charged that the trial judge had a fixed opinion as to who murdered Officer Haddock, and that the judge had made remarks in open court indicating prejudice, but the remarks are not shown, nor is the nature of the remarks and when made and in the presence of whom set out.

It is our conclusion that the record is insufficient to support a charge of prejudice on the part of the trial judge. The matters set forth in the application are insufficient. We conclude further that the application should have been filed in sufficient time prior to trial to have made possible a hearing in this court, or that the hearing had in the trial court should have been transcribed and reflected in the case-made. See Tit. 22 O.S. 1951 § 575; Starrett v. Freeman, 32 Okla. Cr. 366, 241 P. 207; Young v. State, 74 Okla. Cr. 64, 123 P. 2d 294.

As heretofore stated, the within case had been set on the court docket to be tried on February 25, 1952, and in addition to filing application for change of judge, on February 23, 1952, an application for change of venue was also filed some time on the same day, the hour not being shown. A notice of the filing was served on the county attorney. The application raised the objections interposed in application for change of judge and it is also alleged that certain newspaper and radio publicity was prejudicial to the defendant. Attached to the application were thirteen affidavits, all being of practically the same wording. Four signers were housewives, three were "retired" persons, and three were apparently of the same family. Whether the affiants lived in one community of the county or were from different communities is not shown. It is evident that counsel or someone prepared a form of affidavit and caused the various persons thereafter to sign such stock affidavits. It is stated:

"That there is a prejudice existing in said county against the defendant * * * that the same is without just or sufficient cause and prevails generally

throughout the county * * * that this affiant has considerable acquaintance with the citizens of this county; and this affiant states that a fair and impartial trial of the above entitled action by a jury cannot be had by said defendant. * * *"

It will be observed that while each signer sets out that he or she has "considerable acquaintance with the citizens of the county", it is not stated whether the particular affiant had discussed or heard discussed by citizens throughout the county or even in any particular part of the county, the case involving the defendant. A person might have a wide acquaintance throughout the county, but may not have travelled throughout the county since the case arose or have even heard it discussed by others. The allegations amounted to mere conclusions.

In Starr v. State, 5 Okla. Cr. 440, 115 P. 356, this court said:

"On application for a change of venue, the affidavit of the defendant in support thereof must not only aver 'that the minds of the inhabitants of the county in which the cause is pending are so prejudiced against the defendant that a fair and impartial trial cannot be had therein,' but it must also set forth the facts rendering a fair and impartial trial there improbable."

The application for change of venue was not heard until February 27, when counsel for defendant announced that they had no different evidence to offer other than cumulative evidence, whereupon the court treated the application and affidavits insufficient as a matter of law and overruled the application. Counsel cite no case in support of their contention that the action of the court constituted an abuse of discretion and was erroneous. The record discloses that the county attorney was engaged in a term of court. In addition to the insufficiency of the affidavits, there was involved the reasonableness of the notice served only one full day prior to the time the case was set for trial. The record fails to disclose that there was any difficulty in obtaining a jury, or even that the peremptory challenges were exhausted. We conclude that the trial court did not err in refusing to grant a change of venue under the circumstances set out. See 22 O.S. 1951 § 561; Jones v. State, 94 Okla. Cr. 359, 236 P. 2d 102, syllabus 10-12; Rucker v. State, 88 Okla. Cr. 15, 195 P. 2d 299, 199 P. 2d 221; Rawls v. State, 86 Okla. Cr. 119, 190 P. 2d 159; Fry v. State, 91 Okla. Cr. 326, 218 P. 2d 648; Goss v. State, 24 Okla. Cr. 383, 218 P. 339.

This brings us to a consideration of the action of the court in overruling the demurrer of the defendant to the evidence introduced by the state.

The defendant stood on his motion and did not offer any evidence. The State used six witnesses. The evidence was circumstantial.

Counsel for defendant say, in their brief, that "there was no evidence showing or even tending to show the defendant guilty of the alleged crime of murder." Counsel then cite the case of Miller v. State, 92 Okla. Cr. 382, 223 P. 2d 557, wherein this court held that "The findings of the jury on a disputed question of fact will not be disturbed on appeal where there is competent evidence in the record to sustain the jury's findings." Also cited to the same effect are the cases of Sukovaty v. State, 94 Okla. Cr. 391, 236 P. 2d 696, and Odell v. State, 94 Okla. Cr. 159, 232 P. 2d 158. This principle of law has from time to time been approved by this court from the beginning. Counsel insist: "But nowhere has any court yet said, known to counsel, that a verdict of guilty will be sustained where there is no evidence proving guilt, as in the case at bar."

This court has also said that a conviction may be had on circumstantial evidence when all circumstances proven are consistent with each other and with hypothesis that defendant is guilty and inconsistent with every other rational

hypothesis. Brown v. State, 9 Okla. Cr. 382, 132 P. 359; Berrie v. State, 55 Okla. Cr. 302, 29 P. 2d 979; Griffin v. State, 79 Okla. Cr. 85, 151 P. 2d 812; Hood v. State, 80 Okla. Cr. 175, 157 P. 2d 918; Clark v. State, 83 Okla. Cr. 137, 173 P. 2d 750; Hilyard v. State, 90 Okla. Cr. 435, 214 P. 2d 953, 28 A.L.R. 2d 961.

The court gave proper instructions concerning circumstantial evidence, and no complaint is raised as to the instructions given, so that the problem is reduced to a consideration of the sufficiency of the evidence.

Bill Baker testified that he had been sheriff of Bryan county since January 1, 1951. That around 5 o'clock in the morning, December 13, 1951, he learned of the death of Morgan Haddock, town marshall at Caddo. Witness stated that he accompanied Highway Patrolman O. O. Campbell and County Attorney Mills from Durant to Caddo to investigate the death. They arrived about 5:15 a.m. Witness stated that they found the body of Mr. Haddock in the driveway of Jones Brothers Filling Station on Main street. He was lying on his right side, with his right hand stretched out and gripping a flashlight. He had on his gloves and a cigarette was in his mouth, and his pistol was buckled in its holster. Witness stated that an examination of the body disclosed a gunshot wound just above the nipple on the left side, and that the heart was partially protruding from the hole. That after conferring with the accompanying officials witness decided to go find Jack Jackson, also known as Jasper Lee Wininegar, who was staying at the home of his mother-in-law, a Mrs. Gossett. They arrived there at about 6 o'clock in the morning and found the defendant in bed.

Witness testified:

"I woke him up. I said, 'Jack, this is Bill Baker.' He said, 'Yes, Bill, what do you say?' I said, 'Get up, I want to talk to you.' And his wife spoke up and wanted to know what the trouble was. I said, 'Get up and put on your clothes, Jack, and I will talk to you outside.' "

Witness further stated that Mrs. Gossett, defendant's mother-in-law, protested, and witness said to her:

"Well, there has been a man killed up here and we are going to make an investigation, and I am going to take Jack into custody until I find out what has happened, and Jack said, 'OK, that is all right. I will be ready in a minute.' "

Witness asked the defendant when he had used his car, and he stated "Yesterday evening". Defendant denied having loaned the car to anyone. But Officer Campbell had been investigating the car and told the sheriff in the presence of the defendant that he had raised the hood of the car and that the engine was still hot, and that he had found fresh blood on the side of the car. In reply to that defendant volunteered the statement that one of his children's nose had bled on the car as he was driving him to school the morning before. He stated the blood was on the outside of the righthand rear door, about the size of half a pear, and was not yet fully dry. The sheriff testified that he brought the defendant on to Durant to the jail.

On cross-examination the sheriff stated that he had taken the defendant into custody for investigation and that all statements made by the defendant were voluntarily made without threats or corecion, and that he made no attempt to get a written statement. The defendant asked questions and answered questions.

The sheriff testified that he went back to the jail the next morning around 8:30 to 10 o'clock and talked to the defendant a little and left him and returned to his office, and that he received information from Officer Campbell soon that defendant wanted to see him again so he went back up stairs. Said the sheriff:

"A. We went in the little jailer's scuttle-hole there where the jailer stays, outside the cells, and sat down. I said, 'Jack, what did you have on your mind?'

'Bill', he said, 'I want to talk to you. I want to tell you the truth. Now', he said 'I was in that car, and was driving the car, but I didn't shoot Morgan Haddock.' I said, 'Who did?' and he said, Hiram Robinson shot Morgan Haddock.' And I said, 'Did you see him shoot him?' 'Well', he says, 'I didn't see the blaze of the gun, but I heard it "boom", and I looked around and saw a man fall. And Hiram was getting out of the back seat, and when he did, he run.' I said, 'Where did he go?' And he said, 'I don't know.' And I said, 'What did you do?' And he said, 'Got back in the car, had one foot on the concrete, and I got back in the car and shot the gas to it and took off.'

"Q. Did he tell you where he went? A. Went south. Said, 'I didn't go very far. I thought I would turn around and go see if I could find him.' He said, 'When I found him he was walking west on the west side of town, carrying the shotgun. I called him out to the car and asked him where he was going, and he said, 'I am going to the old man's'. He said, 'Get in and come and go with me.' And he said, 'No, I am not going.' And he said, 'I went on out to Clarence Hickses' and took the shotgun where I borrowed it. And went on back to the Hat Powell corner south of the fish hatchery and went on home.

"Q. What time was it he told you that he got back? A. I said, 'Did Hiram go with you?' And he said, 'Yes, sir.'

"Q. I beg your pardon? A. He said, 'Yes sir, he went with me.'

"Q. Went out where? A. To Hickses' to take the gun. And I said, 'Well, when you got out to Hickses, when you took the gun out there and left it, and you come back to Hat Powell corner, what did you do with Hiram?' And he said, 'He went home.'

"Q. He said what? A. He said, 'He went home.' 'Well,' I said, 'then what happened?' He said, 'I went to bed.' "

Witness further testified that the defendant told him, "Bill, let me lay down and sleep a while, and I will tell it all. If you will, I will take you and show the gun." Witness stated that defendant wanted to sleep until 4:00 a.m., and that at said time he and Highway Patrolmen Peak and Brown, and Deputy Bud Taylor went with the defendant to locate the gun. That defendant directed them to drive to the old cotton gin at Caddo. It was drizzling rain when they got there, and the officers waded around in the weeds looking for the gun where he, said Robinson had thrown it, but they could not find the gun, so they got in the car and started back to Durant, and when they got near the town of Armstrong defendant said, "Turn your car around, and I will take you to get the gun." They drove back to Caddo and were directed to a little house then under construction, but could not find the gun where defendant said they might. Defendant then directed them to drive to the house of Clarence Hicks and stated that they would find the gun there. They awoke Mr. Hicks and he got the gun, a double-barrel, 12 gauge sawed-off shotgun with hammers, and they took the gun to the car and showed it to the defendant, and he said, "That's it." Witness stated that on the way back to Durant the defendant said that he borrowed the gun from Mr. Hicks the evening before to go duck or quail hunting, and that he borrowed four shells, that he shot one of them and took three back. That they were number 4 drop shot. Witness testified that in his opinion the wound suffered by Morgan Haddock had been inflicted by a shot from a 12 gauge shotgun, with that type of shot. The gun was received in evidence without objection.

The sheriff admitted on cross-examination that he did not advise the defendant that what he might say might be used against him, but insisted, as to the defendant, "He just told me he wanted to talk to me." The sheriff stated that at one time during the day he talked to defendant about a lawyer, but the details of the conversation were not developed by counsel.

O. O. Campbell, highway patrolman, testified substantially as did Sheriff Baker concerning the facts of the finding of the body of Officer Haddock, and concerning the arrest of the defendant and his transportation to the jail in Durant. It was his opinion that the gun shot wound described caused the death of the officer. He reiterated the conflicting stories told by the defendant concerning the blood on the rear door of his car and the shooting. He testified that finally defendant said, quoting witness: "He might as well tell the truth about it,—that he was not going to burn up for what somebody else did;" and he said that the blood on the door was that of Morgan Haddock. He claimed that Hiram Robinson shot the officer, using the sawed-off shotgun in question. Witness Campbell did not accompany the sheriff and defendant when they went to locate the shot gun. Witness stated that the defendant's statements were made voluntarily, that no one threatened him. Said he: "I heard the sheriff tell him more times than once that he wouldn't be hurt, that he wouldn't be bothered, and that he wouldn't permit anybody to bother him."

Clarence Hicks testified that he lived four miles northwest of Caddo; that about 20 minutes to 12 o'clock the night of December 12, 1951, Jasper Lee Wininegar came to his house:

"A. He asked me if my .22 was at home and I told him 'yes'. He then asked me if I had any .22's—and if I had any shotgun shells, and I said, 'yes'. I told him I had five or six or seven. 'Well', he said, 'I want to borrow your shot-gun.' * * * He said, 'I have got some ducks located I want to kill.' Q. Did you have any discussion with him about the number of shells you had? A. Yes sir. I told him I had five or six shells. Q. Did he obtain any shells? A. Yes, sir; four. Q. What kind of shot were in those shells? A. Fours."

Witness then identified the twelve gauge sawed-off shotgun in evidence as State's Exhibit No. 1, as the gun that he loaned defendant. Witness stated that after defendant left he heard a car start up but did not know whether or not persons were with defendant.

Witness was asked and answered further questions as follows:

"Q. Now, did you later on that night see him again? A. Yes, sir. Q. What time was that? A. It was 20 until 2:00 or 20 after 2:00; I wouldn't be positive, one of the two though. Q. In the negihborhood of 2:00 o'clock, was it? A. Yes, sir. Q. What happened then? A. Well, he brought the gun back and said, 'Thanks, I only used one shell.' And so he just said a few words and left. Q. Did he bring you the gun back? A. Yes, sir. Q. What did he do with the other shell? A. I don't know. He never said and I never asked him. Q. I didn't understand you? A. I said, he never said and I never asked him. Q. Did he give you any shells back? A. Yes, sir. Q. How many? A. Three. Q. Did he tell you what he did with the other one? A. No, sir. Q. And when he brought it back it was on the morning of the 13th? A. Yes, sir. Q. And in your best judgment it was around 2:00 o'clock? A. Yes, sir. Q. Now, did you later on see Sheriff Barker and one of the the Highway Patrolmen? A. Yes, sir. Q. When? A. It was the next night after that about 5:00 in the morning. Q. What, if any-thing, were they doing then? A. They came out there and told me they wanted that gun that Jack borrowed from me. Q. And did you produce the gun for them? A. I told them, I said 'It is sitting right there in the corner, where he brought it in.' And he asked me if there had been anything done to it. And I said, 'No, sir, it is just like he brought it in.' "

Witness Hicks testified that defendant might have had a few drinks but that he would not say that he was drunk; that he borrowed his guns before, and made himself at home at his house.

Mary Hicks, wife of witness Otis Hicks, testified to being present when defendant came to borrow the shotgun of her husband and being present when he

returned the gun the same night he borrowed it. Her statements were substantially as those of her husband, except that her husband stated one time in his testimony that defendant said he wanted the gun to go quail hunting, and she thought he said duck hunting.

Arthur L. Goodrich testified that he lived in Caddo right across the street from the place where the body of Morgan Haddock was found; that he went to bed about 10:30 or 11:30 o'clock the night of December 12, 1951; that a Mr. Lassiter, who roomed with him, came in about 1:00 o'clock thereafter; that some time around 2:00 o'clock he was awakened by what sounded to him like a shotgun blast.

Chilly Reese, deputy sheriff, testified that he lived in Caddo; that he had known the defendant about five or six years personally, but had known of him for a long time; that he knew that prior to December 12, 1951, defendant had been staying at his mother-in-law's home about six miles north of Caddo. Witness stated that he was called at about 4:15 the morning Morgan Haddock was killed and notified that someone was down drunk at the filling station on the corner of Main street and the highway at Caddo; that it was cold weather so he hurried down and found the body of Morgan Haddock. The body was still warm under the arms. The sheriff, county attorney and highway patrolman Campbell soon arrived. Witness described the body, the wound, etc., much as did the sheriff. He stated that after defendant's arrest he talked to him one time and he admitted borrowing the sawed-off shotgun from Mr. Hicks. He admitted on cross-examination that defendant told him that the shot was fired by another person from the back seat of his car, and that it looked to him like the shot may have been fired from the back seat.

While the above evidence is entirely circumstantial, it in uncontradicted, except for the attempt of the defendant to place the blame on a third party in his final statements to the officers. We conclude from a study of all the evidence that all the circumstances proven are consistent with each other and the hypothesis that defendant is guilty, and inconsistent with every other rational hypothesis.

From our summary of the state's evidence, however, the question arises as to whether the statements made by the defendant to the officers were rendered inadmissible by reason of the fact that defendant was not warned that such satements might be used against him. There is nothing in the record to show that the officers induced the defendant to make the statements that he was shown to have made, by any promises of reward, nor were they induced by coercion or threats, but, on the contrary, the evidence shows that the statements made by the defendant were voluntarily made, and finally in an effort to place the blame for the actual shooting on a codefendant.

In Coleman v. State, 70 Okla. Cr. 246, 104 P. 2d 1004, 105 P. 2d 431, in paragraph three of the syllabus, this court, speaking through Barefoot, J., said:

"The fact that the defendant was under arrest and in jail, and was not warned that any statement made by him might be used against him, will not affect the admissibility of any voluntary statement made by him, which would otherwise be competent."

See, also, Hendrickson v. State, 93 Okla. Cr. 379. 229 P. 2d 196.

We therefore conclude that the statements made by defendant to the officers were, for the reasons given, admissible in evidence.

It is finally complained that the special prosecutor committed reversible error by stating his personal opinion as to defendant's guilt.

Only a part of the statements complained of are shown in the record. A part thereof seems to be in answer to statements of counsel of the defendant attempting to persuade the jury that to enter a verdict assessing the penalty of death would make them guitly of taking defendant's life. The portion of the statement particularly complained of reads:

"You would be the instrument of the law, the instrument of the hands of the law. You would be no more the instrument in taking the life of this man when you condemn him to die for the wrongs that he has done to society, and that he has done to the people of Caddo, and that he has done to this good woman and her daughters over here in the corner of the court room, you would no more be guilty of that than His Honor would when he rendered the sentence, nor would the Court Reporter, with the pen that he holds in his hand would be as he writes down the proceedings of this trial. They are just instruments in the hands of the law that you as jurors are sworn to uphold. Will you do that, gentlemen of the jury, when you go into your jury room? Will you follow the instructions that his Honor has given you that you don't have to fire that shot? I don't ask you to decide this,—I don't think there is any question but that this defendant fired the shot that took the life of Morgan Haddock. But, be that as it may; if it was Robinson that did it, it was this defendant that procured the gun. It was this defendant that procured the shells; it was this defendant that loaded the gun; it was this defedat that took the gun back home, and it was this defendant that lied about where he had been and what he been doing. Every act that he did under the testimony, gentlemen, is indicative of his guilt,—not to say, gentlemen, of any other hypothesis other than his guilt of murder. And I know that you are going to find, gentlemen, in your verdict, and when you do that, society will be satisfied."

Counsel for defendant stated: "We object to that." The Court. "I will order the word 'society' stricken". The record fails to show that specific objection was interposed to any other particular portion of the statement.

The argument of counsel seems to have been based on the evidence before the jury and not on anything outside the record. While counsel apparently believed strongly in his theory of the case and was attempting to "Out Herod Herod" in answering the argument of opposing counsel, construing that argument in connection with the entire record we do not conclude that the language was such as to arouse the passion and prejudice of the jury to the extent that they were swayed from arriving at a fair and just sentence. Patrick v. State, 95 Okla. Cr. 141, 241 P. 2d 418.

The judgment and sentence of the district court of Bryan county is affirmed.

JONES and BRETT, JJ., concur.